**The People of the State of Illinois et al., Appellees, v. Illinois Central Railroad Company and Southern Illinois and Kentucky Railroad Company, Appellants.**

## Gen. No. 30,026.

COURTS—*jurisdiction of State courts to enjoin act of interstate railroad authorized by Interstate Commerce Commission.* The State courts have no jurisdiction to enjoin a railroad chartered under State laws but engaged in interstate commerce from purchasing the property of another which is to be built or from leasing or operating such road or consolidating the property or franchises of the two roads where it is intended to operate the two roads together with a third road to be constructed in an adjoining State as well as with an existing bridge corporation, the whole to form an important cut-off, the business over which would be almost exclusively interstate, where application for permission to do so has been made to the Interstate Commerce Commission, a hearing had thereon after proper notices to the State authorities and others, and the commission has found that public convenience and neces-

sity require the construction of the new lines and the operation and control of them by defendant railroad company and issued an order permitting defendant to take the steps necessary to effect such consolidation and operation under the authority of the Transportation Act of 1920.

Interlocutory appeal by defendants from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the third division of this court for the first district. Reversed and remanded with directions. Opinion filed April 29, 1925. Rehearing denied May 14, 1925.

WALTER S. HORTON, ROBERT V. FLETCHER, VERNON W. FOSTER and EDWARD C. CRAIG, for appellants.

OSCAR E. CARLSTROM, Attorney General, HARRY EUGENE KELLY, Special Assistant, DAVID S. LANSDEN and WILLIAM S. DEWEY, for appellees.

MR. JUSTICE THOMSON delivered the opinion of the court.

This is an appeal from an interlocutory decree enjoining the Illinois Central Railroad Company (to which we shall refer as the Illinois Central) from purchasing the capital stock of the Southern Illinois and Kentucky Railroad Company (to which we shall refer as the Southern Illinois) or from purchasing the property or railroad of that company, or from leasing or operating such property, and also enjoining the Illinois Central from consolidating its stock, property or franchises with the stock, property or franchises of the Southern Illinois, and also enjoining the latter company from doing any of these things. This temporary restraining order was entered in the superior court of Cook county on the bill of complaint, the several answers of the two defendants, and certain affidavits submitted by the parties in support of their respective positions.

The allegations of the bill disclose that the Illinois Central was chartered by an Act of the General As-

sembly of Illinois in 1851. By the terms of that charter the company was authorized to build a railroad along a specified right of way, the main part of which was to extend from Chicago to the City of Cairo, at the southern end of the State, at the juncture of the Ohio and Mississippi rivers. The company built the lines of road specified by its charter and these lines of railroad in Illinois are known as the charter lines of the company. These lines have been operated by the Illinois Central continuously since 1851, in conjunction with its system of lines extending from Chicago to the Gulf of Mexico. South of Cairo, the Illinois Central operates over the lines of a company known as the Chicago, St. Louis and New Orleans Railroad Company (to which we shall refer as the New Orleans) which is a nonoperating company, all the stock of which is owned by. the Illinois Central. Some distance south of Cairo and east of the Mississippi river, the New Orleans passes through the City of Fulton in the State of Kentucky. Some distance north of Cairo and east of the Mississippi river, the Illinois Central passes through the City of Edgewood in the State of Illinois. A comparitively straight line drawn from Fulton north to Edgewood crosses the Ohio river at or near the City of Metropolis, Illinois, which is located some distance east of Cairo.

In April, 1923, certain officers and directors of the Illinois Central incorporated the Southern Illinois under the General Railroad Incorporation Act passed in 1872. By the terms of its charter, that company was authorized to construct a railroad from Edgewood, Illinois, to the Ohio river at Metropolis. The New Orleans is engaged in the building of a new line north from Fulton, Kentucky, to the Ohio river, where it will connect with the new road to be built by the Southern Illinois over a bridge now in existence over the Ohio river at that point. It is the pur-

pose of the Illinois Central to advance the money needed to build these new lines, and to lease them when built, or acquire running rights over them; to acquire control of the Southern Illinois, by purchase of its capital stock and thereafter to purchase the line of the Southern Illinois, if that course seems desirable. Neither the Illinois Central nor the Southern Illinois has made any application to the Illinois Commerce Commission for any license or authority in connection with the building of the new road in Illinois. Under the terms of the charter of the Illinois Central, that company pays annually to the State of Illinois 7 per cent of the gross receipts derived from traffic over its charter lines in this State, in lieu of all taxes on those lines.

The Illinois Central and Southern Illinois companies filed separate answers to the bill of complaint. These answers alleged, among other things, that shortly after the incorporation of the Southern Illinois, that company and the Illinois Central and the New Orleans joined in an application to the Interstate Commerce Commission, seeking the authority of that commission, on behalf of the Southern Illinois, to build its line in Illinois; on behalf of the New Orleans, to build its line in Kentucky; and on behalf of the Illinois Central, to purchase and hold the stock of the Southern Illinois, and to lease and operate that line and also the line to be built by the New Orleans. Notice of this application was given to the Governor and the Attorney General of the State of Illinois, as provided by law, and the Attorney General, representing the State and also certain citizens of Cairo and other communities located along the line of the Illinois Central, south of Edgewood, intervened in the proceedings before the commission and in opposition to the application which these three companies had made. An extensive hearing was had before the commission on this application, and the defendants al-

lege in their answers that in that connection the commission considered all the questions raised by the complainants in the case at bar.

The report of the Interstate Commerce Commission, filed in connection with the application and hearing above referred to, a copy of which report is attached to the answer of the Illinois Central filed in the case at bar, shows that the commission found that public convenience and necessity required. and will require the construction of the new line from Edgewood to Metropolis, by the Southern Illinois; and the new line from Fulton, Kentucky, to Metropolis, by the New Orleans; and also required that the Illinois Central be authorized to purchase the capital stock of the Southern Illinois, and to acquire and operate the railroad to be built by that company in Illinois, and also the road to be built by the New Orleans in Kentucky. The. order of the Interstate Commerce Commission, among other things, provided that the Illinois Central "is hereby authorized to acquire control" of the Southern Illinois "by purchase of the capital stock of that Company," and further, that the acquisition by the Illinois Central of the new railroad to be built by the New Orleans, in accordance with the terms of the lease existing between that company and the Illinois Central, "is hereby approved and authorized."

By the prayer contained in their bill of complaint, complainants asked the court to enter a decree restraining the Southern Illinois from building its proposed railroad from Edgewood to Metropolis and restraining the Illinois Central from advancing any money or assistance to the Southern Illinois for that purpose; or to the New Orleans for the purpose of constructing its proposed new line in Kentucky; from assuming any liability for any mortgage bonds of the Paducah and Illinois Railroad Company, which is the company operating the railroad bridge over

the Ohio river at Metropolis; and, further, restraining the Illinois Central from leasing or acquiring running rights over either the new line of the Southern Illinois or the new line of the New Orleans; and from acquiring or purchasing the property, franchises or capital stock of the Southern Illinois or consolidating the same with the capital stock, property or franchises of the Illinois Central; and, further, restraining the Southern Illinois from entering into any such arrangements with the Illinois Central. The lines of railroad proposed to be built by the Southern Illinois and the New Orleans, which would extend when constructed from Edgewood, Illinois, to Fulton, Kentucky, are referred to in the record as the "Edgewood Cut-off."

As hereinabove stated, the chancellor, on motion of the complainants, entered an interlocutory decree enjoining the Illinois Central from purchasing the capital stock of the Southern Illinois or from purchasing, leasing or operating its property; and also enjoining the Illinois Central from consolidating its stock, property or franchises with those of the Southern Illinois; and also enjoining the latter company from doing the same things; holding that the things thus enjoined, if done, would be in violation of provisions of the constitution (separate section 1 and art. XI, sec. 11, Illinois State Constitution) and laws (Cahill's St. ch. 114, ¶¶ 23, 32) of the State of Illinois, providing that no contract obligation of the Illinois Central, to pay money into the State treasury "shall ever be released, suspended, modified, altered, remitted, or in any manner diminished or impaired by legislative or other authority," and further, that "no railroad corporation shall consolidate its capital stock, property or franchises, with any other railroad corporation owning a parallel or competing line"; and further, that "no railroad corporation shall be permitted to purchase any railroad which is a parallel or competing line."

In support of the decree appealed from, the complainants contend that the Southern Illinois is but the creature of the Illinois Central, being used by the latter as a "dummy" to accomplish the building of a railroad which the Illinois Central has not the charter power to build and the building of which is prohibited by its charter; that if the proposed Edgewood Cut-off is built, the contract rights of the State of Illinois with the Illinois Central will be seriously impaired, in that the traffic now moved over its charter lines will be reduced, resulting in a corresponding reduction in the 7 per cent of the gross receipts from such traffic, received by the State under the charter; that the effect of the building of the Cut-off will be to move the main line of the Illinois Central to a new location contrary to the terms of its charter; and if the Southern Illinois is to be considered as a separate corporation, having no agency relation to the Illinois Central, as contended by defendants, then the new line of railroad proposed will be a line paralleling and competing with the Illinois Central, and such being the case, the provisions of the constitution and laws of Illinois are such as to prohibit the Illinois Central from bringing about a consolidation of the two lines by the Illinois Central purchasing the capital stock of the Southern Illinois, or leasing its line and the new line to be built by the New Orleans, or by acquiring running rights over such lines. The defendants contend, on the contrary, that none of the things they propose to do, in connection with the construction and operation of the Edgewood Cut-off, are within the prohibitions of either the constitution or laws of the State of Illinois, and that the operation of the Cut-off will not have the effect contended for.

But the main contention of the defendants presents the question of the jurisdiction of the State courts to pass upon the matters complained of by the complainants, in their bill, in view of the action which

has been taken in the premises by federal authority,—namely, the Interstate Commerce Commission,—as set forth by the defendants in their answers, and in view of the provisions of the United States Constitution and the federal statutes. In our opinion, this jurisdictional question is decisive of this case, and we shall therefore not have occasion to pass upon any of the other questions which have been presented.

The second paragraph of article VI of the United States Constitution provides that: "This Constitution and the laws of the United States which shall be made in pursuance thereof    *    *    *    shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." Under the third paragraph of section 8 of article I of the United States Constitution, Congress is declared to have power to regulate commerce among the several States.

Section 1 of the Interstate Commerce Act provides that the provisions of that act shall apply to common carriers engaged in interstate commerce. Certain provisions of the Interstate Commerce Act, as it is now constituted, were adopted by Congress in 1920, by the passage of the act known as the Transportation Act. Subsection 18 of section 1 of this act (41 U. S. St. L., ch. 91, p. 477) provides that "no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line

of railroad, and no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall have first been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

Subsection 19 of the same section of the Act, provides that the application for and the issuance of any such certificate shall be under such rules and regulations as to hearings as the commission may prescribe, and that upon receipt of any application for such certificate, the commission shall cause notice thereof to be given the Governor of each State in which such additional or extended line of railroad is proposed to be constructed or operated, or in which such railroad or portion thereof, or the operation thereof is proposed to be abandoned, with the right to be heard in connection with the application.

Subsection 20 of the same section of the Act provides that: "The Commission shall have power to issue such certificate as prayed for, * * * in the application * * *. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby."

Paragraph 2 of section 5 of the Interstate Commerce Act (41 U. S. St. L., ch. 91, p. 481) provides that: "Whenever the Commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to the Act, that the acquisition, to the extent indicated by the Commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the con-

solidation of such carriers into a single system for ownership and operation, will be in the public interest, the Commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises.''

Paragraph 8 of said section 5, provides that: ''The carriers affected by any order made under the foregoing provisions of this section and any corporation organized to effect a consolidation approved and authorized in such order shall be, and they are hereby, relieved from the operation of the 'antitrust laws,' as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section.''

Paragraph 2 of section 20a of the Act, provides that it shall be unlawful for any carrier to issue any capital stock or bonds, ''even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission  *  *  *  the Commission by order authorizes such issue  *  *  *.''  This paragraph further provides that the commission shall make such order only if it finds that such issue of stock or bonds is for some lawful object within the corporate purposes of the applicant, and compatible with the public interest which is necessary or appropriate for, or consistent with, the proper performance by the carrier of service to the public, and that such issue is reasonably necessary and appropriate.

Paragraph 7, of the section referred to in the preceding paragraph, provides that the jurisdiction conferred upon the commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations, or liabilities in accordance with the provisions of this section without securing approval other than as specified therein.

It was provided by sections 207, 208 and 211, of the Judicial Code; Act of October 22, 1913, 38 U. S. St. L., ch. 32, secs. 219-220, that: ''The Commerce Court (district court) shall have  *  *  *  jurisdiction  *  *  *  over all cases  *  *  *  brought to enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission''; that such ''suits to enjoin, set aside, annul, or suspend, any order of the Interstate Commerce Commission, shall be brought in the Commerce Court (district court) against the United States''; that ''No order or injunction  *  *  *  restraining or suspending an order of the Interstate Commerce Commission shall be made by the Commerce Court (district court) otherwise than upon notice and after hearing, except that in cases where irreparable damage would otherwise ensue to the petitioner, said court, or a judge thereof may, on hearing after not less than three days' notice to the Interstate Commerce Commission and the Attorney General, allow a temporary stay or suspension in whole or in part of the operation of the order of the Interstate Commerce Commission  *  *  *''; and that ''No interlocutory injunction suspending or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, any order made or entered by the Interstate Commerce Commission shall be issued or granted by any district court of the United States, or by any judge thereof, or by any circuit judge acting as district judge, unless the application for the same shall be presented to a circuit or district judge, and shall be heard and

determined by three judges, of whom at least one shall be a circuit judge, and unless a majority of said judges shall concur in granting such application. When such application aforesaid is presented to a judge, he shall immediately call to his assistance to hear and determine the application two other judges. Said application shall not be heard or determined before at least five days' notice of the hearing has been given to the Interstate Commerce Commission, to the Attorney General of the United States, and to such other persons as may be defendants in the suit.''

By the Act of Congress of October 22, 1913, being a certain part of the Urgent Deficiency Appropriations Act, of that date, 38 U. S. St. L., sec. 219, it was provided that: ''The Commerce Court * * * is abolished * * * and the jurisdiction vested in said Commerce Court'' (by the act creating it) ''is transferred to and vested in the several district courts of the United States.'' The same act provided that the venue of any suit thereafter brought, to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission, shall be in the judicial district wherein the party or parties upon whose petition the order was made resides, with certain exceptions, and it contains further provisions which it will not be necessary to set forth here.

It is the contention of the complainants that they are making no attack on the orders which have been entered by the Interstate Commerce Commission, as set forth by the defendants in their answers. The complainants contend that the bill for injunction which they have filed is, in no sense, a proceeding to enjoin, set aside, annul or suspend the orders of the commission, but that it is merely a proceeding to enjoin the defendants from doing the things complained of, which complainants contend are not permitted by the charter of the Illinois Central and are contrary to the provisions of the constitution and the laws of

this State. The complainants make no reference to the Interstate Commerce Commission in their bill, nor do they mention any of the proceedings instituted by the defendants before the commission or orders entered in the course of those proceedings. It is, of course, clear that if the State courts granted complainants the relief prayed for by them in their bill of complaint, the decree granting such relief would leave the certificates and orders of the Interstate Commerce Commission still in existence and in force, and, in that sense, the bill cannot be referred to as a direct proceeding to "enjoin, set aside, annul or suspend," the commission's orders. But it is equally clear that if the interlocutory decree, which the defendants seek to reverse by this appeal, or any decree entered by the State courts, granting complainants the relief for which they pray in their bill, is allowed to stand, the action which has been taken by the Interstate Commerce Commission on petition of these defendants and over the objections of these complainants will thereby be completely nullified. While the bill which has been filed by complainants in the State court is not a direct proceeding to "enjoin, set aside, annul or suspend" the orders of the commission, that will be both the intended and the inevitable effect of a decree granting the relief prayed for.

In our opinion, the contention of complainants above referred to is fully met by the decision of the United States Supreme Court in the case of *Lambert Run Coal Co. v. Baltimore & O. R. Co.*, 258 U. S. 377. There, as in the case at bar, a bill in equity was filed in a State court against an interstate carrier in which the court was asked to restrain the carrier from making a distribution of coal cars in accordance with certain rules of distribution which were complained of as unjust and discriminatory. There, as in the case at bar, no mention was made, in the bill of complaint, of the Interstate Commerce

Commission or the fact that the rules of distribution complained of had been promulgated by the commission. The defendant had the cause removed to the Federal District court and there filed an answer and moved to dismiss the bill on the ground that the case was not one within the jurisdiction of the State court; that the rules of distribution complained of had been prescribed by orders of the Interstate Commerce Commission; that "the bill was thus one to restrain enforcement of an order of the Commission, and that the United States and the Commission were indispensable parties." The District court granted complainant's motion for an interlocutory injunction, over defendant's objection, to the effect that the proceeding was one to stay an order of the commission and to the effect that under the Federal statutes, to which reference has herein been made, the judge to whom the complainant applied for the injunction was without power to consider it, in the absence of two other judges. The District court overruled defendant's objections and granted the interlocutory injunction prayed for. On appeal to the Circuit Court of Appeals, that interlocutory appeal was reversed, the court apparently passing on the merits involved. On further appeal to the United States Supreme Court it was held that the decree of the District court was properly reversed by the Court of Appeals, but that the latter had no occasion to pass upon the merits of the case but that the direction to the District court should have been to dismiss the bill for want of jurisdiction. In the course of its opinion the Supreme Court said: "The rule of the railroad here complained of was that prescribed by the Commission. To that rule the railroad was bound to conform unless relieved by the Commission or enjoined from complying with it by decree of a court having jurisdiction. By this suit such a decree was, *in effect*, sought * * *. In such a suit, an injunction of

the District court could be granted only by three judges. But there are in addition two fundamental objections to the jurisdiction. First, the United States, an indispensable party to suits to restrain or set aside orders of the Commission, was not joined, and could not be, for it has not consented to be sued in State courts. Secondly, such suits are required to be brought in a Federal District court. Judicial Code, par. 208, 211; Act of October 22, 1913, ch. 32, 38 Stat. L. 208, 219; * * * *Illinois Cent. R. Co. v. Public Utilities Commission of Illinois*, 245 U. S. 493, 504; *North Dakota ex rel. Lemke v. Chicago & N. W. Ry. Co.*, 257 U. S. 485; *State of Texas v. Interstate Commerce Commission*, 258 U. S. 158. The fact that this was a suit to set aside an order of the Commission did not appear on the face of the bill; but it became apparent as soon as the motion to dismiss was filed. Jurisdiction cannot be effectively acquired by concealing for a time the facts which conclusively establish that it does not exist. As the State court was without jurisdiction over either the subject-matter or the United States, the District court could not acquire jurisdiction over them by removal * * *. The plaintiff may not, by alleging a * * * fictitious situation, confer upon a court jurisdiction which, as determined by the plaintiff's real cause of action, it has not. * * * And the vital interest of the United States was one which the plaintiff could neither ignore nor prejudice by indirection * * *. The District court should therefore have dismissed the bill as soon as it became apparent that the suit was one to set aside an order of the Commission * * * and the Circuit Court of Appeals, in remanding the cause to the District court, should have directed a dismissal for want of jurisdiction and without prejudice.''

In our opinion that decision of the Supreme Court and the cases cited by that court in the course of

its opinion are decisive of the jurisdictional question presented by this appeal. Complainants have attempted to distinguish that case from the one at bar, contending that the *Lambert Run* case involved rules on car distribution which had been promulgated by the Interstate Commerce Commission, and which were mandatory in character and that the carrier there involved was bound to observe them, while the case at bar involves carriers which have merely obtained the permission of the commission to do certain things and that such permission does not oblige the carrier to do those things, and that the bill filed here does not seek to annul or set aside or enjoin the granting of such permission, but merely raises the point that the things which the commission has said the carrier *may do,* so far as interstate commerce is concerned, they should be prohibited from doing by the State courts, as being in violation of the State Constitution and laws. A further distinction is attempted, in the contention that in the *Lambert Run* case the court was not considering an instrumentality of interstate commerce, while in the case at bar the court is dealing with a railroad which has not been built but which, when built, will be an instrumentality of interstate commerce; that the regulation of interstate commerce includes the regulation of the persons and things transported, but does not include the regulation or creation of instrumentalities wholly within the State, citing *Louisville & Nashville R. Co. v. Commonwealth of Kentucky,* 161 U. S. 677. In our opinion, these contentions are not sound. The Supreme Court held in the *Louisville & Nashville* case that it was not true that the police power cannot be exercised over a subject confined exclusively to Congress by the Federal Constitution, saying that: "While this is true with respect to the commerce itself, it is not true with respect to the instruments of such commerce   *   *   *. In the division of author-

ity with respect to interstate railways, Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the states remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests. If it be assumed that the states have no right to forbid the consolidation of competing lines, because the whole subject is within the control of Congress, it would necessarily follow that Congress would have the power to authorize such consolidation in defiance of state legislation,—a proposition which only needs to be stated to demonstrate its unsoundness." That decision was rendered in 1896, nearly 25 years before Congress passed the Transportation Act in 1920, which was stated in one of the recent decisions of the United States Supreme Court (*Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co.*, 257 U. S. 563) to mark a new departure in railroad legislation in the United States. That Act deals specifically with the instrumentalities of interstate commerce, including the construction of new extensions or entirely new railroads, which are to be used in interstate commerce. The Act provides that no carrier "subject to this Act," shall undertake the construction of a new line of railroad until it obtains a certificate from the Interstate Commerce Commission that the present "or future" public convenience and necessity require "or will require" its construction. What carriers are "subject to this Act"? Section 1 of the Act says it shall apply to carriers "engaged in" interstate commerce. In our opinion, a reasonable construction of those provisions necessitates applying the provisions of the Act to a carrier which proposes the construction of a railroad, even located wholly within the State, which is, when built, to engage in interstate commerce.

The record in the case at bar shows that practi-

cally all the business to be done by the Southern Illinois over its road to be built as a part of the proposed Edgewood Cut-off will consist of interstate commerce. It would be an exceedingly narrow construction of the Interstate Commerce Act, as amended by the Transportation Act, to hold that it could not be applied to a railroad, practically all of the business of which is to be in the nature of interstate commerce, until it was built and had started to operate, in view of the parts of the Act quoted above.

It may be that the orders of the Interstate Commerce Commission involved here are not mandatory in the sense that orders are which have been promulgated by the commission, involving rates or distribution of equipment, such as those involved in the *Lambert Run* case. In our opinion, so far as the question of jurisdiction is concerned, it is not important to determine whether the orders of the commission affecting these defendants were mandatory or merely permissive. If they are only the latter, as complainants contend, and valid, the defendants have the right to do the things specified in the orders. As above quoted, the act specifically provides not only that the railroads have the right to do the things for which the commission issues its certificate and order as provided by the act, but that they may do so "without securing approval other than such certificate" and further, that any carrier affected by any order giving it the right to acquire control of another carrier, either by lease or purchase of stock, shall be relieved from the operation of the antitrust laws, "and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything *authorized* or required by any order" of the commission. In the *North Dakota* case, 257 U. S. 485, cited by the Supreme Court in the *Lambert Run* case, the State of North Dakota filed an original bill in equity,

in the United States Supreme Court, seeking to prevent certain railroads from applying an order of the Interstate Commerce Commission authorizing them to increase their rates on certain intrastate traffic upon a finding that the existing rates on that traffic were an unjust discrimination against interstate commerce within certain provisions of the Transportation Act. It will be seen that the order of the commission there involved was not mandatory but merely permissive, in the sense argued by complainants with reference to the orders of the commission involved in the case at bar, and yet the Supreme Court held in the *North Dakota* case, that the suit brought by the State was in effect one to set aside or suspend the order of the commission there complained of, and therefore, by the provisions of the Judicial Code, hereinabove cited, the United States must be made a party and that the United States has consented to be sued only in the United States District Court, and that such suits must be brought there. The Supreme Court said in the course of its opinion that the suit there brought was ''a proceeding in equity in which the requirements of complete justice and of public policy must be taken into account. When they are considered, it seems to us pretty clear that the State should be remitted to the remedy offered by the statutes,—a suit in the District court in which the United States is made a party * * *. As to public policy, Congress has indicated the policy of the United States * * *. There is no doubt that a State can sue in the District court when the United States is a party and has consented to be sued there and has not expressed its consent to be sued elsewhere * * *. The right of the State is sufficiently protected by its right to appeal from the decision of the District court.''

If there might be some question as to whether the order of the commission involved in the *North Dakota*

case was permissive rather than mandatory, there certainly could be none as to the orders of the commission involved in the *Eastern Texas Railroad* cases cited by the United States Supreme Court in the *Lambert Run* case, and appearing under the title, *State of Texas v. Eastern Texas R. Co., et al,* in 258 U. S. 204, and again in 264 U. S. 79. These decisions both involved two cases. The Eastern Texas Railroad Company was a Texas corporation owning and operating a railroad situated wholly within that State. Three-fourths of its business was interstate traffic. The company was operating its road at a loss and it applied for and obtained a certificate of convenience and necessity and an order of the Interstate Commerce Commission giving the company permission to abandon its line of railroad in *interstate* commerce upon certain conditions. The State of Texas brought a suit in a Texas State court against the railroad company, to enjoin it from ceasing to operate its road in *intrastate* commerce, contending that under the State laws the company was obliged to continue to operate its road in *intrastate* commerce, and that the order of the commission was void in so far as it authorized the abandonment of the road in intrastate commerce. This case was removed to the United States District Court. There the railroad pleaded the certificate and order of the commission in defense of the action brought by the State. The District court held that the certificate and order of the commission was a complete defense, and dismissed the suit, and the State appealed to the United States Supreme Court. In the meantime the State of Texas had instituted another suit in the United States District Court, under the provisions of the federal statutes, to annul and set aside the certificate and order of the Interstate Commerce Commission. That case was also dismissed and was likewise appealed to the United States Supreme Court by the

State. The Supreme Court considered the two cases together and handed down one opinion, reversing the decrees of the District court in both cases. Complainants in the case at bar contend that the decision of the Supreme Court in these cases should be conclusive in favor of upholding the jurisdiction of the State court, inasmuch as one of the Texas cases was a case brought by the State in a State court, which, on removal to the District court, was heard just as any other case removed from a State court and not under the so-called jurisdiction act, and although it involved as a defense a certificate and order of the Interstate Commerce Commission, the Supreme Court did not dismiss it on the ground that such a case could be brought only under the jurisdiction act providing for enjoining, setting aside, annulling or suspending an order of the commission, but took jurisdiction of the case and heard it and held that the order of the commission was no defense and thus sustained the contention of the State to the effect that, as to intrastate commerce, the railroad could not be abandoned without the consent of the State.

In our opinion, there are several reasons why that contention cannot be upheld. In the first place the question of jurisdiction, so far as the opinion of the Supreme Court indicates, was not raised by the parties nor considered by the court. One of the two cases was brought as required by the terms of the jurisdiction act, and involved precisely the same questions as the other case, and consequently, all matters presented for the court's consideration on the merits of the controversy were properly before the court anyhow and, therefore, no occasion was presented for raising any question as to jurisdiction. But in the second place, considering the opinion of the Supreme Court as expressly approving the right of the District court to take jurisdiction of the case originally brought in the State court by the State

of Texas, the decision may not be given the effect contended for by the complainants here.  The jurisdiction act does not provide that *all* actions involving certificates and orders of the Interstate Commerce Commission shall be brought only in the District court. It provides that cases brought "to enjoin, set aside, annul or suspend" the commission's orders shall be brought in that court.  In the *Eastern Texas* cases, the Supreme Court held that the orders of the Interstate Commerce Commission which were there involved could not be given such a wide operation and effect as to authorize the carrier affected, to abandon its road entirely and cease handling, not only interstate traffic but intrastate traffic as well.  In other words, under the decision of the Supreme Court in these cases, that action brought by the State of Texas in the State court was an action to enjoin the defendant railroad from abandoning its road so far as *intrastate* business was concerned, and that was in no sense an action to enjoin, set aside, annul or suspend the order of the Interstate Commerce Commission, because that order could not be given the effect of authorizing the railroad to abandon its road except so far as, and only so far as, *interstate* commerce was concerned.

It having been held in the *Eastern Texas Railroad* cases, that although the Interstate Commerce Commission has issued a certificate and order giving a railroad company the right to abandon its road located within a State, in *interstate* commerce, the State may nevertheless go into one of its own courts and enjoin the company from abandoning its *intrastate* business, it by no means follows, as complainants seem to contend, that when the commission has issued its certificate and order giving such a company the right and authority to *build* its road and engage in interstate commerce, the State may likewise go into one of its courts and enjoin the company from

so doing. In the first instance the action of the State has no effect whatever on interstate traffic nor upon the order of the Interstate Commerce Commission, while in the latter it completely blocks both. The situation presented in the case at bar will thus be seen not to be analogous to that presented in the *Eastern Texas Railroad* cases or any other case where the Interstate Commerce Commission has *allowed* a State carrier to *abandon* its interstate business. A case involving abandonment, to be analogous to the situation presented in the case at bar, would be one where the commission had *denied* the petition of the State carrier for leave to abandon its interstate business. After such action by the commission, a State could not, under the provisions of the Interstate Commerce Act, take such action, either through its courts or a State Commission, as would permit such a company to tear up its road and thus abandon not only its intrastate business but also its interstate business and thus completely nullify the action taken by the Interstate Commerce Commission with regard to the road's interstate business.

Similarly, the question presented in *Wabash, C. & W. R. Co. v. Commerce Commission,* 309 Ill. 412, is not involved in the case at bar. In that case, a company proposing to build a railroad wholly within this State had applied to the Interstate Commerce Commission for a certificate of convenience and necessity and an order permitting it to build its road and engage in interstate traffic, and the commission denied it. Thereafter, the company applied to the State Commission for an appropriate certificate and order, permitting it to build its railroad and engage in intrastate traffic, and it was allowed over objections of other carriers. On appeal to the circuit court the order of the State Commission was affirmed and on appeal to the Illinois Supreme Court the decree of the circuit court was likewise affirmed. In the course

of its opinion the Supreme Court said its attention had been called to the order of the Interstate Commerce Commission denying the prayer of the carrier in question "to engage in interstate commerce." The court then said they could not review that decision of the commission "nor give it any weight in the determination of this case." Of course, the question presented to the State court in that case had nothing to do with interstate commerce and the order of the Interstate Commerce Commission, denying the petition of the carrier for leave to build its railroad wholly within the State and engage in *interstate* traffic, was not in any sense "enjoined, set aside, annulled or suspended" by the action of the State Commission and the State courts granting its petition for leave to build its railroad and engage in *intrastate* business. The case at bar presents the exact opposite of that situation. Here the Interstate Commerce Commission has *granted* the petition of the defendants, authorizing one of them to build a railroad in this State, and the other to control it, which it has found the future public convenience and necessity require in connection with *interstate* commerce. The defendants, under the terms of the Interstate Commerce Act, have the right to proceed to do those things, without seeking any further authority and the courts of this State have no jurisdiction to enter any order, judgment or decree which will, in effect, "enjoin, set aside, annul or suspend, in whole or in part," the findings and orders of the Interstate Commerce Commission. The State, through its proper representatives, as well as the other complainants, was before the Interstate Commerce Commission when the orders involved here were entered and the certificates granted. As pointed out by Mr. Justice Holmes in the *North Dakota* case, *supra,* if the State takes exception to the certificates and orders of the commission, it may sue in the District court, where, and

where alone, the United States, which is a necessary party, may be sued, and, as there further pointed out, "the right of the State is sufficiently protected by its right to appeal from the decision of the District court," to the United States Supreme Court.

Citation of authorities should not be necessary in support of the proposition that Congress has complete and paramount power to regulate commerce among the several States and that this power covers not only rates and regulations but also the instrumentalities of commerce and that, in exercising such power, it may authorize a corporation to do things not contemplated by its charter, issued by the State of its creation, as in *California v. Central Pac. R. Co.*, 127 U. S. 1. In *Houston, E. & W. T. Ry. Co. v. United States*, 234 U. S. 342, it was pointed out that interstate trade may neither be destroyed nor impeded by the rivalries of local governments. In the course of its opinion in that case, the court said: "The fact that carriers are instruments of intrastate commerce as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care." That the Transportation Act marked a new departure in the field of railroad regulation and that Congress has complete and exclusive power over that field so far as interstate commerce is concerned, not only in the matter of rates and other regulations but the issue of railroad securities and the control of one road by another and the construction of extensions and new lines, has been established in a number of recent decisions of the United States Supreme Court. *Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co.*, 257 U. S. 563; *State of New York v. United States*, 257 U. S. 591; *Dayton-*

*Goose Creek Ry. Co. v. United States,* 263 U. S. 456; *Railroad Commission of California v. Southern Pac. Co.,* 264 U. S. 331. The exclusive jurisdiction of Congress and the Interstate Commerce Commission over these matters has been recognized by our Supreme Court in *Chicago & E. I. Ry. Co. v. Miller,* 309 Ill. 257, and *Cleveland, C., C. & St. L. R. Co. v. Commerce Commission ex rel. Dering Coal Co.,* 315 Ill. 461. In the latter decision the court cites the case of *Detroit & M. Ry. Co. v. Boyne City, G. & A. R. Co.,* 286 Fed. 540, which involved a proposed, but as yet unbuilt, extension of a railroad located entirely within a state but which extension, when built, would become a part of that railroad which was engaged in interstate commerce.

For reasons stated, the interlocutory decree of the superior court is reversed. Following the decision of the United States Supreme Court in the *Lambert Run* case, *supra,* we hold further that the superior court should have dismissed the bill as soon as it became apparent that the suit was one to set aside an order of the Interstate Commerce Commission. Following the ruling of the court in that case, this cause is remanded to the superior court with directions to dissolve the injunction involved in the decree appealed from and dismiss the bill of complaint for want of jurisdiction.

*Decree reversed and cause remanded with directions.*

O'CONNOR, P. J., and TAYLOR, J. concur.