## SOUTHERN RY. CO. v. SHEALY et al.

District Court, E. D. South Carolina. March 31, 1927.

No. 369.

1. **Commerce ☞85(3)—Power to regulate use of terminal facilities by interstate railroad is in Interstate Commerce Commission (Interstate Commerce Act, § 1 [3], being Comp. St. § 8563, and § 3 [4], as amended by Transportation Act, § 405, being Comp. St. § 8565[4]).**

By Interstate Commerce Act, § 3 (4), as amended by Transportation Act, § 405 (Comp. St. § 8565[4]), construed in connection with section 1 (3), being Comp. St. § 8563, power to regulate the use of terminal facilities of an interstate railroad, including all sidings and switch and spur tracks, is vested in the Interstate Commerce Commission, to the exclusion of the states.

2. **Commerce ☞85(3)—Authority of Interstate Commerce Commission may include, incidentally, power to regulate intrastate traffic.**

Where interstate and intrastate transactions both are involved in the use of terminal facilities, the regulation of the latter is so incidental to, and inseparable from, the regulation of the former, as to be deemed included in the authority to regulate such use conferred by statute on the Interstate Commerce Commission.

3. **Commerce ☞58—Eminent domain ☞2(8)— State Railroad Commission's order requiring interstate railroad to furnish use of terminal facilities to another road held void for want of jurisdiction and failure to provide compensation.**

An order of a State Railroad Commission, requiring an interstate railroad company to furnish the use of terminal facilities and tracks to another company, *held* void for want of jurisdiction, and for the further reason that it failed to make any provision for compensation, in violation of the constitutional provision against the taking of property without compensation.

In Equity. Suit by the Southern Railway Company against Frank W. Shealy and others constituting the Railroad Commission of South Carolina, and others. Decree for complainant for permanent injunction.

Frank G. Tompkins, of Columbia, S. C., Barnwell & Grimball, of Charleston, S. C., and Chas. J. Rixey, Jr., of Washington, D. C., for complainant.

J. M. Daniel, Atty. Gen., Cordie Page, Asst. Atty. Gen., and Elliott & McLain, of Columbia, S. C., for defendants.

Before PARKER, Circuit Judge, and WATKINS and ERNEST F. COCHRAN, District Judges.

· WATKINS, District Judge. This is a suit in equity, brought by Southern Railway Company against the South Carolina Railroad Commission and its individual members, and the Attorney General and Assistant Attorney General of the state, to enjoin the enforcement of an order of the Commission requiring the railway company to switch, receive, and deliver over and upon three of its side tracks at Union, S. C., carloads of freight tendered it by the Buffalo, Union-Carolina Railroad. A temporary restraining order was granted by the District Judge, and an interlocutory injunction was ordered by the court of three judges constituted for the trial of the cause. By consent of the parties the testimony was ordered to be taken by a special master, and has been so taken and reported, and the cause is now before us for final hearing.

The bill sets out in detail a number of specifications to show the illegality of the order of the Commission. These may be briefly summed up under the following subdivisions:

(1) That the order contravenes the commerce clause of the United States Constitution and the Interstate Commerce Commission Act, as amended by the Transportation Act of 1920 (41 Stat. 456).

(2) That it violates the provisions of the Constitution of South Carolina and the Fifth and Fourteenth Amendments of the Constitution of the United States, by depriving the railroad of its property without due process of law or just compensation, and by denying it the equal protection of the laws.

(3) That the order is too vague and indefinite to be of any force; that it is unreasonable and oppressive, and its enforcement would serve no public interest.

Along with the testimony taken orally before the special master is submitted the record and testimony produced at the hearing before the Railroad Commission. This body consists of seven members, of whom four concurred in the order, while three, including the chairman, dissented. A copy of the petition of the Buffalo, Union-Carolina Railroad is set out in full at the foot of this opinion.[1] No opinion was filed, nor was there any discussion of the facts, nor any statement of the grounds upon which the order of the Commission was based, further than that due notice had been given to the interested parties, that the hearing was had and the testimony taken, and counsel

heard in argument for both sides. The order passed was as follows:

"The matter has been considered, and on July 2, 1925, a majority of the Commission adopted the following resolution: 'Resolved that the petition of the Buffalo, Union-Carolina Railroad filed with the South Carolina Railroad Commission on February 10, 1925, be granted.' In view of the above facts, the majority of the Commission issues the following order:

" 'It is ordered that Southern Railway Company comply with the petition of the Buffalo, Union-Carolina Railroad hereinabove referred to, a certified copy of which is herewith attached and made a part of this order. This order to remain in effect until the further orders of the Commission.' "

To this decision the chairman filed a dissenting opinion, reviewing the facts of the case in detail, and outlining with much force the reasons for his dissent, which was concurred in by two other commissioners. It will be observed that the order is general in its terms, and does not purport to limit the requirement to intrastate traffic.

As relates to the pertinent facts in the case, there is no considerable controversy. The Buffalo, Union-Carolina Railroad is a short line, extending from Pride, where it connects with the Seaboard Air Line Railway, through Union to Buffalo, all within the state of South Carolina. The distance from Pride to Union is 16 miles, and from Union to Buffalo about 4 miles. At the latter place is a large cotton-manufacturing plant known as the Union-Buffalo Mills. This corporation owns all, or substantially all, of the stock of the railroad. This railroad is engaged in both intrastate and interstate transportation, a considerable proportion of its business being of the latter character. It has terminals in the city of Union, but not as expensive nor as conveniently situated to the center of business as those of the Southern Railway Company. It exchanges traffic with the Seaboard Railway at Pride. The Southern Railway operates a total of 6,971.8 miles in numerous states, of which 1,127 miles are located within the state of South Carolina, and is, of course, engaged in both intrastate and interstate transportation. One of its main lines extends from Columbia, through Union, to Spartanburg, and then on west through Asheville, North Carolina. At Carlisle, 13 miles from Union, it intersects, and there exchanges freight, with the Seaboard Air Line Railway. Carlisle is two miles from Pride via Seaboard. It will thus be seen that the freight moving to or from Union via the Seaboard could move

[1] See 18 F.(2d) 790.

18 F.(2d)—50

by the Southern at from one to five miles less distance than by the Buffalo, Union-Carolina Railroad, depending upon the direction from which the freight came. In such case the freight charge would be the same or less than if transported over the last named road.

There is no dispute of the fact that the three tracks in the city of Union, which are the subject of this controversy, are the property of the Southern Railway Company, and were constructed and are maintained by it at its own exclusive expense. There is no contention, nor any evidence, that it has by any written agreement assigned these tracks or any portion thereof to the use of any particular shipper or consignee. There are several industrial or assigned sidings operated by the Southern at Union under contract to serve adjacent industries. The contracts in such cases are essentially different from the leases executed by the railway company to those having warehouses near the tracks in question. Track 1 branches off of the main line of the Southern Railway near Main street and extends 631 feet in a northerly direction west of the freight depot. From it carload freight not destined for an industrial or assigned siding is unloaded into wagons or trucks. The railroad company owns the property on both sides of this track, which it designates as its team track, and the evidence shows it in fact to be a track of that character. A number of stores have been built near this track under leases from the railroad company, but in each case there is space for a wagon way between these and this side track, and this passageway is regularly used by such vehicles and trucks for ingress and egress to and from the cars placed on the track for delivery of freight. Carloads of freight consigned to lessees, having stores near the track, are usually (and always, when practicable, without interfering with the general service of delivery to other points on the track) placed directly opposite the store or warehouse to be served, and in such case the freight is delivered direct over portable or extension platforms, thrown across the intervening space, and removed when the unloading is completed, or otherwise, as the exigencies of the general service of the track may require. Delivery to these stores and warehouses, however, may be and sometimes is made at other points along the track, from which the freight is transported by wagon or truck.

The written leases in all cases designate this track as a team or house track. One of the leases is for a fixed period of five years, though most of them reserve the right to the railroad company to require the removal of the structures and reclaim possession of the leased premises upon 60 days' notice. By far the greater proportion of cars delivered on this track are for other consignees than those whose stores or warehouses have been constructed in proximity to it. Track 2 begins at a point near the depot and on the west side of the main track, and extends parallel with and close alongside thereof for a distance of 1,031 feet in the direction of Spartanburg. It is designated as a passing track, its principal use being for the storage of empty cars and of loads awaiting placement and forwarding. Camp cars are also stored on this track. Track 3 lies immediately west of the main track, extending from track 2, in front of and past the freight depot, for a distance of 1,210 feet in the direction of Columbia. It is designated as and in fact is a house track, handling all less than carload lots of freight to and from the depot. It is used to a large extent for transhipping local freight, which has been forwarded to Union in interstate commerce, for distribution.

Several stores and warehouses have been built near track 2, and a roller mill and grocery store have been established near track 3. At times cars are placed by the railroad in front of these for the delivery there of carload freight for the convenience of the parties, but not so as to interfere with the paramount use for which these tracks were constructed. Where delivery is made direct from cars to consignees, it is made either over portable or ribbon platforms. None of the parties so accommodated have contributed anything whatever to the construction or maintenance of these tracks, and no contract exists in their behalf for the assignment or use of any portion of these sidings. The railroad merely allows cars to be placed on the tracks from time to time for the convenience of the parties alongside, where this will not interfere with their paramount use as passing or storage and house tracks.

A considerable amount of evidence was introduced to show the requirements of the Southern Railway in the use of these three tracks, and also to show that there is no general or public demand for or public convenience to be served by the enforcement of the order complained of. We are satisfied that the order could not be put into effect without materially endangering or delaying their paramount purpose of serving the public generally as a team track, a passing track, or a house track. If specific spaces should be assigned upon these tracks, or any one of them, to the exclusive or particular use of the store or other enterprise to be served, there would

inevitably arise frequent occasions in which the public at large to be served by these tracks would be inconvenienced and delayed. The testimony strongly indicates that these facilities are no more than reasonably sufficient to all times to accommodate the public needs.

[1] Upon these facts we are of opinion that the order of the Commission is invalid, first, as unlawful interference with interstate commerce; and, second, because it deprives complainant of property without due process of the law. The Interstate Commerce Act, as amended (Comp. St. § 8563 et seq.), prior to the Transportation Act of 1920, not only failed to confer upon the Interstate Commerce Commission the power to require one carrier to extend the use of its terminal facilities and tracks to another, but, on the contrary, expressly prohibited the exercise of such power, and it was held generally to be within the police power of the states to regulate such use. The jurisdiction of the federal courts was also limited generally to cases arising under the Fifth and Fourteenth Amendments to the Constitution. It would too greatly prolong this opinion to enter into a detailed recapitulation and discussion of all the provisions of the act, as now amended by the Transportation Act, which bear upon the present issue.

It is sufficient to say that paragraph 4 of section 3 of the act as it now stands must be construed in connection with the provisions of section 1, and particularly with paragraph 3 thereof, wherein the application of the act to railroads is made to include "all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property," and the term "transportation" is defined to include "locomotives, cars and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, * * * and handling of property transported." Paragraph 6 extends the provisions of the act to the delivery of the property for transportation, the facilities for transportation, and all other matters relating to the transporting, storing and delivery of the property. Paragraph 9 extends the provisions of the act to private side tracks constructed or to be constructed for the benefit of shippers, who will furnish sufficient business to justify the construction and maintenance of same. Paragraph 4 of section 3 clothes the Commission with power, upon finding it to be in the public interest and to be practicable, without substantially impairing the ability of the owning carrier, to extend the use of its terminal facilities and main line track or tracks for a reasonable distance outside of such terminal to other carriers, on such terms and for such compensation as the carriers may agree upon or upon failure to agree, upon such terms and for such compensation as the Commission may require.

The only limitation upon the jurisdiction of the Commission is set out in paragraph 22 of section 1, which, by its terms, is made to relate only to the authority of the Commission conferred by paragraphs 18 to 21, both inclusive. These sections confer jurisdiction upon the Commission over the extension of railroad lines, and the construction, acquisition, and operation of new lines, and the abandonment of old lines or portions thereof, and also provisions for car service, etc. Paragraph 22 provides: "The authority of the Commission conferred by paragraphs 18 to 21, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one state, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." The effect of this proviso was construed in the case of Western & Atlantic R. R. v. Georgia Public Service Commission et al., 267 U. S. 493, 45 S. Ct. 409, 69 L. Ed. 753.

In that case the railroad sought to discontinue switching service to a shipper on an industrial siding. An order of the state Railroad Commission required the continuation of this service, and upon an appeal from the decree of a three-judge court refusing a temporary injunction, it was held that the order of the state Commission was valid for the reason that, under the provisions of the Transportation Act, the power to order the establishment or abandonment of such side tracks, though employed largely for interstate commerce, is not with the Interstate Commerce Commission, but with the state. In that case it appears that the service had been rendered for years under a voluntary arrangement, and under statutory powers had been made irrevocable by the state Commission except by its consent. The spur track was for a public purpose, and it was held that the requirements that such service should not be discontinued without notice and hearing was clearly within the police power of the state—

citing Chicago & N. W. R. Co. v. Ochs, 249 U. S. 416, 39 S. Ct. 343, 63 L. Ed. 679; Lake Erie & Western R. Co. v. Cameron, 249 U. S. 422, 39 S. Ct. 345, 63 L. Ed. 684; Railroad Commission v. Louisville & N. R. Co., 148 Ga. 442, 96 S. E. 855. See, also, Railroad Commission of California v. Southern Pacific Co. et al., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713.

It will be observed that this paragraph reserves the control of the state only as to the construction and abandonment of the tracks therein mentioned, and does not mention their use or regulation, which, in other sections, is specifically committed to the jurisdiction of the federal Commission, and that the reservation is limited expressly upon the activities of the federal Commission acting in pursuance of the provisions of paragraphs 18 to 21, inclusive. Numerous decisions of the Interstate Commerce Commission and of the states since the passage of the Transportation Act are to the effect that Congress has fully occupied the field of regulation of terminal facilities by placing the control thereof as relates to interstate railroads in the federal Commission. Team Track Switching at Argentine, Kansas, 73 Interst. Com. Com'n R. 367; Hastings Commercial Club et al. v. C., M. & St. Paul Ry. Co., 107 Interst. Com. Com'n R. 208; Atchison, T. & S. F. R. Co. v. Railroad Commission, 190 Cal. 214, 211 P. 460; People v. Public Service Commission, 233 N. Y. 113, 135 N. E. 195, 22 A. L. R. 1073.

In Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472, the court said of the Transportation Act: "The new Act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. * * * To achieve this great purpose it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the [Interstate Commerce] Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged." See, also, New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Railroad Commission v. Chicago, Burlington & Quincy R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Railroad Commission of California v. Southern Pacific R. Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713.

In the case last above cited, after discussing various sections of the Transportation Act, showing the jurisdiction of the federal Commission over switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of persons or property, including freight depots, yards and grounds, the court stresses the fact that the Act requires carriers to afford all reasonable facilities for the exchange of traffic between their respective lines and that the Commission may, in the public interest and without impairment of a carrier's power to handle its own business with its terminal facilities, require the use of its terminal facilities, including its main track or tracks for a reasonable distance outside of its terminal, for another carrier or carriers upon such terms as may be agreed upon by the parties, fixed by the Commission or determined by suit as in condemnation proceedings.

It is obvious, therefore, that paragraph 22 of section 1 of the act above referred to in no way restricts the power of the Commission as reiterated in various sections of the Act to supervise and control the interchange of traffic over the spur, industrial, team, switching or side tracks of interstate railways. If such construction were allowed, instances might easily arise in which the regulatory powers of the federal and state Commissions would come in direct conflict. In Missouri Pacific R. R. Co. v. Stroud, 267 U. S. 404, 45 S. Ct. 243, 69 L. Ed. 683, it is held that there can be no divided authority over interstate commerce, and that the acts of Congress on that subject are supreme and conclusive. See, also, Southern Ry. Co. v. Reid, 222 U. S. 424, 32 S. Ct. 140, 56 L. Ed. 257; Southern Ry. Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Pennsylvania R. Co. v. Public Service Commission, 250 U. S. 566, 40 S. Ct. 36, 63 L. Ed. 1142.

Two very recent decisions of the Supreme Court of the United States are in point and appear to us to clear up and settle beyond controversy the question at issue. In Alabama & V. R. Co. et al. v. Jackson & E. R. Co. et al., 271 U. S. 244, 46 S. Ct. 535, 70 L. Ed. 928, it was held that the jurisdiction to determine whether a junction may be established between main lines of two railroads, both engaged in interstate as well as local commerce, is exclusively in the Interstate Commerce Commission. The court said: "It was not until Transportation Act 1920, c. 91,

41 Stat. 456, conferred upon the Commission additional authority, that. it acquired full power over connections between interstate carriers. * * * By paragraph 4 of section 3 it empowered the Commission to require one such carrier to permit another to use its terminal facilities 'including main-line track or tracks for a reasonable distance outside of such terminal.' * * * The fact that it may do so shows that the jurisdiction of the Commission over such connections must be exclusive, if the duty imposed upon it to develop and control an adequate system of interstate rail transportation is to be effectively performed. Moreover, the establishment of junctions between the main lines of independent carriers is commonly connected with the establishment of through routes and the interchange of car services, and is often but a step toward the joint use of tracks. Over all of these matters the Commission has exclusive jurisdiction."

The court said further: "In matters relating to the construction, equipment, adaptation and use of interstate railroad lines, with the exceptions specifically set forth in paragraph 22, Congress has vested in the Commission the authority to find the facts and thereon to exercise the necessary judgment."

The latest case is that of the United States of America and Interstate Commerce Commission v. New York Central R. Co., 47 S. Ct. 130, 71 L. Ed. ——, decided November 22, 1926. While the case involved the right to require the railroad company to provide transportation service between the public terminals of the Erie Barge Canal at Buffalo and shippers located along its tracks and along the lines of other railroads, with which it could interchange traffic, and the placing and removal of cars on the tracks within its terminals, the general provisions of the Transportation Act were invoked. The conclusion of the court was summed up as follows:

"The Commission having jurisdiction over the carriers and the facilities by which the transportation is carried on, the question is narrowed to whether its jurisdiction extends to the entire current of commerce flowing through this terminal although intrastate in part. When we consider the nature and extent of the commingling of interstate and intrastate commerce, and the difficulty of segregating the freight passing through the terminal, we think it clear that Congress in employing such broad language as 'the Commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated' intended to confer upon the Commission power to regulate the entire stream of commerce. Where as here interstate and intrastate transactions are interwoven, the regulation of the latter is so incidental to and inseparable from the regulation of the former as properly to be deemed included in the authority over interstate commerce conferred by statute. This was the view of the state court. People ex rel. New York Central R. Co. v. Public Service Commission, supra, 198 App. Div. 436, 191 N. Y. S. 636, affirmed without opinion in 232 N. Y. 600 [132 N. E. 904]. Cf. State of Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729; Dayton-Goose Creek R. Co. v. United States, 263 U. S. 456, 485, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; Texas & P. R. Co. v. Gulf, etc., R. Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578. An interpretation of the statute which would in practice require the segregation of all shipments in interstate commerce would make compliance with the Commission-sion's orders impossible and defeat the purpose of the act."

[2] In the instant case the order of the state Commission was comprehensive, including traffic of all kinds. No attempt was made to distinguish between intrastate and interstate commerce and under the authority last above cited, because of the intermingling of interstate and intrastate transactions, if the order be construed as applicable only to the latter, its regulation is so incidental to and inseparable from the regulation of the former as to bring the entire subject within the exclusive jurisdiction of the Interstate Commerce Commission.

[3] It will further be observed, as stated above, that the order of the state Commission makes no provision for fixing compensation for the services required. The power to do this as well as the power to require the common use of terminals is vested in the Interstate Commission. Even if the power were in the state Commission, the order passed is void for lack of provision for compensation. Louisville & N. R. Co. v. Central Stock Yards Co., 212 U. S. 132, 29 S. Ct. 246, 53 L. Ed. 441. This case arose before the passage of the Transportation Act of 1920. In it the Central Stockyards Company sought to require the use of the terminals of the railroad company for the receipt, switching, transport, and delivery of all live stock from the Central Stockyards to any one at the Bourbon Stockyards at Louisville, Ky. The Constitution of the state of Kentucky contained a provision which, in effect, required such prac-

tice. A previous decision of the court had held this provision of the state Constitution to be void, in so far as it attempted to control interstate shipments as an attempt to regulate interstate commerce. Central Stockyards Co. v. Louisville & N. R. Co., 192 U. S. 568, 24 S. Ct. 339, 48 L. Ed. 565. In the latter decision it was held that the provision in the state Constitution that a carrier must deliver its cars to connecting carriers without poviding adequate protection for their return or compensation for their use amounts to a taking of property without due process of law within the meaning of the Fourteenth Amendment. It was held that since the Constitution made simply a universal undiscriminating requirement with no adequate provisions for protection or compensation, such want could not be cured by inserting the protective provisions in judgments under it, but that the law itself must save the parties' rights and not leave them to the discretion of the courts as such—citing Security Trust & Safety Vault Co. v. Lexington, 203 U. S. 323, 333, 27 S. Ct. 87, 51 L. Ed. 204; Roller v. Holly, 176 U. S. 398, 409, 20 S. Ct. 410, 44 L. Ed. 520. Discussing the provisions in the judgment which required the plaintiff in error to receive at the connecting point and to switch, transport and deliver live stock consigned from the Central Stockyards to any one at the Bourbon Stockyards, the court said:

"If the principle is sound, every road in Louisville, by making a physical connection with the Louisville & Nashville, can get the use of its costly terminals and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot be justified, unless the railroad holds that property subject to greater liabilities than those incident to its calling alone."

In Pumpelly v. Green Bay & M. Canal Co., 13 Wall. 166, 20 L. Ed. 557, the court said: "It is not necessary that property should be absolutely taken, in the narrowest sense of the word, to bring the case within the * * * constitutional provision; but there may be such serious interruption to the common and necessary use of property as will be equivalent to taking, within the meaning of the amendment."

In Louisville & Nashville R. Co. v. Inter-state R. Co., 108 Va. 502, 62 S. E. 369, the Supreme Court of Virginia said: "It is clear that to take from a railroad company the exclusive right to the use of its property, or any part thereof, and limit its use therein to a particular purpose and give another railroad company an equal or joint right in the use of it for that purpose, is a taking within the meaning of the Constitution." See, also, Baltimore & O. R. Co. v. United States, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; Northern Pacific R. Co. v. Department of Public Works, 268 U. S. 39, 45 S. Ct. 412, 69 L. Ed. 836.

For the reasons above outlined, a permanent injunction must be granted.

PARKER, Circuit Judge, and ERNEST F. COCHRAN, District Judge, concur.

### Petition.

To the Railroad Commission of South Carolina:

Your petitioner, Buffalo, Union-Carolina Railroad, respectfully shows:

(1) That petitioner is a railroad and common carrier in South Carolina, authorized to do the business of a common carrier, and having a railroad, an office and side tracks in the city of Union, S. C., and Southern Railway Company is a railroad and a common carrier in South Carolina, authorized to do the business of a common carrier and having railroads, an office and side tracks in the city of Union, S. C.

(2) The Southern Railway Company has in the city of Union a side track leading from its main track at a point on Main street in the city of Union just west of Bailey Builders' Supply Company, and runs thence in a northwesterly direction to T. C. Duncan's warehouse; thence passes a number of shippers, to wit, Gibb's Grocery, Coca-Cola Company, and Hames Grocery Company, and Wagnon's Feed Company, to Eagle Grocery Company, and from said side track freight is unloaded from the car direct into the said places of business, and also a side track beginning on the north side of West Academy street, and running on the west side of the main line of said Southern Railway Company to the main line at Pinckney street; also a track leaving the main line of Southern Railway at Main street and running in a northerly direction, paralleling the main line to West Academy street and known as "house track," and used for the delivery of carload shipments to Eagle Grocery Company.

(3) That your petitioner is entitled to deliver carloads of freight over the two above

side tracks and to have a joint or reciprocal switching exchange with Southern Railway Company, and your petitioner is ready, and always has been ready to grant the same or similar privileges or rights to the Southern Railway Company; but the Southern Railway Company will not switch cars delivered to it by petitioner over the above-described side tracks, giving as a reason therefor that the said tracks are team tracks; but your petitioner alleges and shows that the said side tracks are not team tracks, and that Southern Railway Company does not use them for team tracks.

Wherefore your petitioner prays that Southern Railway Company be required to switch cars for petitioner over the said side tracks in accordance with law. And your petitioner will ever show. Buffalo, Union-Carolina Railroad, by (Signed) S. C. Hoge, General Manager.

Feb. 9, 1925.