RAILROAD COMMISSION OF THE STATE OF CALIFORNIA *v.* SOUTHERN PACIFIC COMPANY ET AL.

RAILROAD COMMISSION OF THE STATE OF CALIFORNIA *v.* ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY.

RAILROAD COMMISSION OF THE STATE OF CALIFORNIA *v.* LOS ANGELES & SALT LAKE RAILROAD COMPANY.

CERTIORARI TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Nos. 283–285.  Argued November 22, 1923.—Decided April 7, 1924.

1. In view of the policy and provisions of the Transportation Act, establishment of a new union station for several interstate carriers, involving the abandonment of their separate stations, extensive changes and relocations of their main tracks and very great expense, cannot be brought about by voluntary action of the carriers or order of a state commission in the absence of a certificate of the Interstate Commerce Commission, under pars. 18–21 of § 402 of the act.  P. 342.

2. The provisions of the Transportation Act, § 402, pars. 18–21, that no interstate carrier shall extend its line of railroad unless and until the Interstate Commerce Commission shall certify that public convenience requires it, and forbidding the Commission to authorize such extension unless it finds it reasonably required in the interest of public convenience or necessity or that the ex-

pense will not impair the carrier's ability to perform its duty to the public,—*construed,* as not confined to extensions with a purpose to include new territory to be served by a carrier, but as including proposed extensions of main tracks within a city to a proposed new union station, involving changes in the intramural destinations of carriers and in the handling of interstate traffic, and necessitating great expense. P. 344.

190 Cal. 214, affirmed.

CERTIORARI to a judgment of the Supreme Court of California, annulling, upon review, an order of the State Railroad Commission which sought to require the above-named railroads to eliminate certain grade crossings and establish a new union terminal depot, in the City of Los Angeles.

*Mr. William W. Clary* and *Mr. Hugh Gordon* for petitioner.

The amendments of 1920 to the Commerce Act vest no power in the Interstate Commerce Commission relative to new union passenger depots.

Section 15a is referred to by the court below only as showing generally the greatly enlarged powers of the Commission and its affirmative duty to maintain an adequate railway service for the people of the United States. Section 5, pars. 4 and 5, relate to the general plan for the consolidation of railway properties of the United States into a limited number of systems. They are quoted in the decision as being expressive of the enlarged scope and purposes of the act. Section 1, pars. 3 and 10, are referred to to show the definitions of the terms " railroad " and " car service." None of these sections makes any reference to depots or terminal facilities.

Section 1, par. 1, gives the Commission power, when an emergency exists, (a) to suspend established rules, (b) to make directions relative to car service, (c) to require joint use of terminals, including main line tracks for a reasonable distance outside of such terminals. This

language does not authorize the Commission to require the erection of a new union depot for permanent use, but refers to the joint use during emergencies of existing terminals.

Section 1, par. 18, refers to the construction, extension and abandonment of railroad lines and provides for the issuance of certificates of public convenience and necessity therefor.

The State Commission ordered neither the construction nor the abandonment of a " line of railroad." True, the erection of a new union depot and the elimination of grade crossings will require a rearrangement of traffic. Some new track may have to be laid and some old track abandoned. The amount of new track necessary is very small.

The Interstate Commission has held that such relocations of trackage not affecting the service to the public, do not constitute either the construction or abandonment of " lines of railroad " within par. 18, § 1 of the Commerce Act. *Matter of Philadelphia, Newtown & N. Y. R. R. Co.,* 67 I. C. C. 252; *Matter of Pearl Valley R. R. Co.,* 67 I. C. C. 748. This is borne out by *Texas* v. *Eastern Texas R. R. Co.,* 258 U. S. 204.

Here, the carriers will not abandon or cease operating their roads or any part of them. They will merely shift their lines in such a way as to carry on the same operations they do now, but with more safety and convenience to the public.

Paragraph 21 of § 1 authorizes the Commission to require any carrier to provide adequate facilities for performing " its car service as that term is defined in the Act " and to extend its line or lines. The term " car service " is defined in par. 10 of § 1 and has to do with the supply, distribution and exchange of cars and locomotives. The clause as to extension of lines is similar to that found in par. 18 of § 1, except that par. 18 applies to cases where

permission to extend is sought by the carrier and par. 21 to cases where the carrier is ordered to extend by the Commission upon its own initiative or upon complaint. In neither case is a mere rearrangement of existing trackage an extension of a " line of railroad " within the meaning of these provisions.    Paragraph 22 exempts from the authority of the Commission, conferred by pars. 18 to 21, inclusive, all construction or abandonment of spurs, industrial tracks, etc., located wholly within one State.

Paragraph 3 of § 3 refers to the interchange of traffic between different carriers, and has no bearing on the issue before the Court.    Paragraph 4 of § 3 refers to existing terminal facilities.    It is not inconsistent with § 36 of the California Public Utilities Act.    Paragraph 4 refers to a " carrier owning or entitled to the enjoyment of terminal facilities."    It provides for the use of the " terminal facilities including main line track for a reasonable distance outside such terminal " of one carrier by another carrier.    It provides that " the carrier whose terminal facilities are required to be so used " may recover compensation.    These expressions plainly mean existing terminal facilities.

It may be claimed that the order cannot be obeyed without a joint use of certain existing facilities such as main line tracks; and that the order is for that reason repugnant to the provisions of par. 4.    The State Commission did not order the railroad companies to carry out any of the proposed plans.    It simply ordered them to construct a depot somewhere within a large area according to plans which they themselves were to prepare.    To say that no possible plan for a union depot can be devised which does not require a joint use of tracks is merely to speculate in advance of any attempt to prepare final plans.

Paragraph 20 of § 1 prohibits the railroads from making any constructions or abandonments of lines of railroad without the consent of the Interstate Commerce Commis-

sion.   The prohibitions of the paragraph refer expressly to pars. 18 and 19 of § 1.   They do not refer to existing terminal facilities, which are covered by § 3, par. 4.   The state court erroneously construed par. 20 to apply to " the extension of railroad facilities and the abandonment of other railroad facilities, including terminals."

As already shown, the order required no construction or extension of new lines or abandonment of old lines within the meaning of the act as construed by the Interstate Commerce Commission.   Nor did it require any joint use of facilities.   The prohibitions of § 20 therefore did not terminate the power of the State Commission to make the order.

The fact that many kinds of regulations are specifically provided for in the act, as, for instance, interchange of traffic, switch connections, car service, securities, extensions into new territory, consolidation of lines, etc., while the act is silent as to any regulation concerning new union depots, indicates that the latter are not covered by the act.

If, after plans are prepared for a union depot in compliance with the State Commission's order, it should be deemed advisable to invoke the jurisdiction of the Interstate Commerce Commission in connection with any part of the work, such as a joint use of tracks, or for the issuance of securities, application may be made to the Interstate Commerce Commission at that time.   The present validity of the order is not affected by this possibility.   Under well settled law, an order of the Railroad Commission is not invalid merely because it cannot be carried out until some other public authority takes additional or concurrent action.   *Motor Transit Co.* v. *Railroad Comm.,* 189 Cal. 573; *Oro Elec. Co.* v. *Railroad Comm.,* 169 Cal. 466; *Turner Co.* v. *Chicago, etc., Ry. Co.,* 36 S. Dak. 310.

The legislative history of the act clearly indicates an intention that jurisdiction over union passenger depots

should not be taken away from the States. See Cong. Rec., Nov. 15, 1919, pp. 9067–9071.

If the amendments of 1920 should be construed to cover the subject of union depots, nevertheless the State's power remains unimpaired and the State Commission's order is valid unless the Interstate Commerce Commission makes an inconsistent order.

The proviso of par. 17, § 1, in plain terms preserves the police power of the State to require just and reasonable freight and passenger service for intrastate business. The fact that a carrier may also be engaged largely in interstate business does not deprive the State of this reserved power unless the State makes a requirement that is "inconsistent with any lawful order of the Commission [interstate] made under the provisions of this act."

The proviso in par. 17 is in effect a congressional enactment of the principle announced in *Missouri Pac. Ry. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, viz., that even when Congress has entered a particular field of interstate commerce and has authorized the Interstate Commerce Commission to exercise jurisdiction therein, nevertheless, unless the matter is one to be handled by general rule or regulation, the States may continue to act as to particular situations unless and until the Interstate Commerce Commission takes action as to such particular situations.

The power of Congress to regulate interstate commerce, although supreme and exclusive, remains dormant until actually exercised. The mere enactment of laws by Congress does not arouse this dormant power unless those laws are of such nature as to exclude any action by the States.

*New York Central R. R. Co.* v. *Public Service Comm.*, 233 N. Y. 113, is not in point, because § 3, par. 3 of the Commerce Act, as amended, specifically provides for the interchange of traffic, and the New York court held that the New York law did not authorize the state commission to make such a requirement.

The State Commission's finding that public convenience and necessity require the operation of a union depot was consistent with, and supported by, the evidence.

The Commission's findings on questions of public convenience and necessity were final and conclusive under the California law.

The Commission under .the police power of the State has authority to order the railroads to erect a union depot as an essential measure for the elimination of dangerous grade crossings. *Erie R. R. Co.* v. *Board of Public Utility Commrs.,* 254 U. S. 394.

The order, in requiring the construction and use of the new union depot and the abandonment of the present facilities, does not deprive railroads of property in violation of the guarantees of the Federal Constitution.

The Commission's requirement that the operation of trains on Alameda Street be eliminated after the construction of the union depot does not impair the obligation of a contract contained in a franchise permitting the railroads to operate trains on Alameda Street.

The Commission's order is not invalid because it may require the railroads to expend large sums of money and to exercise power of eminent domain in acquiring the necessary land and constructing a union depot.

*Mr. C. W. Durbrow,* with whom *Mr. Wm. F. Herrin, Mr. Frank C. Cleary, Mr. J. P. Blair, Mr. F. H. Wood, Mr. Wm. R. Harr, Mr. E. W. Camp, Mr. M. W. Reed, Mr. Gardiner Lathrop, Mr. A. S. Halsted* and *Mr. Fred E. Pettit, Jr.,* were on the briefs, for respondents.

*Mr. John E. Benton* and *Mr. Paul A. Walker,* by leave of Court, filed a brief as *amici curiae,* on behalf of the National Association of Railway and Utilities Commissioners and of the regulatory commissions of twenty-nine States.

97851°—24——22

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

The question in this case is whether the State Railroad Commission of California has power to require the Southern Pacific Company, the Atchison, Topeka & Santa Fe Railway Company and the Salt Lake & Los Angeles Railroad Company to build an interstate union depot in the city of Los Angeles.

The proceedings were begun in 1916 before the Railroad Commission by complaints of Civic Associations and others against the Railway Companies. Before the hearing and the decision were had, the Transportation Act of Congress of 1920 was enacted. In December, 1921, after two hearings, an amended order against the Railways was made by which they were required to remove certain grade crossings and to build a union terminal within a certain defined area in the city.

The Railway Companies sought review of this order in the Supreme Court of the State, and their three writs were heard and disposed of as one case. The Supreme Court of the State held that the order was beyond the power of the State Railroad Commission, because the subject matter was committed to the Interstate Commerce Commission by the Transportation Act of 1920. The court further held that if the order had effected the elimination of grade crossings alone, it would have been valid, but that, associated as it was with the establishment of the Union Station, it must be annulled. We have brought the case of the Commission against each of the railways here by certiorari.

Lines of the three railways approach Los Angeles from the north and come together in the city near the North Broadway viaduct as it crosses the Los Angeles River. Thence the Salt Lake and Santa Fe lines follow the bed of the Los Angeles River, one on its east and the other on its west bank. The Salt Lake passenger station is at 1st

Street.  Its main line from Pasadena and Glendale comes from the north, but its line from Salt Lake comes in from the south.  From north to south in Los Angeles, its line hugs the east bank of the river for three miles.  The Santa Fe Station is opposite that of the Salt Lake Railway on the west bank.  The Santa Fe hugs the west bank for three miles in the city.  One of its lines leaves Los Angeles by the north for Chicago.  Another leaves the city by the south through Riverside for Chicago.  The Southern Pacific does not follow the river bed after passing under the Broadway viaduct but extends in a southwesterly direction until it reaches the north end of Alameda Street.  From that point it runs south through the city at grade on that street.  Its station is at 5th Street and lies southwesterly from the Salt Lake and Santa Fe stations and a quarter of a mile distant from them.  The eastern main line of the Southern Pacific crosses the river at Alhambra Avenue, joins the San Francisco main line and reaches the station from there by the same tracks on Alameda Street.  The Southern Pacific occupies Alameda Street on grade and longitudinally in both directions from its station for three miles.  Its lines toward the South go to San Pedro and Santa Anna.

The order of the Railroad Commission requires the abandonment of the passenger stations of the three railways.  The Southern Pacific Station is a comparatively modern depot and would be adequate for many years.  Those of the other two companies are not adequate, but they have ample ground upon which to construct suitable stations.  The order required the removal from Alameda Street of the main line of the Southern Pacific for three miles, permitting the use of its tracks in that street for switching during a few hours at night.  The order also required that by viaducts over the river and over the Salt Lake & Santa Fe tracks on the river banks, grade crossings should be eliminated.  The order further required

that the three railways should purchase jointly land enough in an area reaching from Alameda Street to the river and from Aliso Street to Alhambra Street to erect a suitable Union Station, to be situated somewhere near a square called the Plaza. The railways are directed to make such additions to, extensions of, improvements and changes in the existing railroad facilities of said companies as may be reasonably necessary and incidental to the use of said Union Passenger Station. This would require the removal of the present station of the Southern Pacific from 5th Street toward the Plaza, at least half a mile, and the stations of the Santa Fe and the Salt Lake from 1st Street on the river to the Plaza more than a quarter of a mile. The changes to be effected under the order will require, in the abandonment of the Southern Pacific main track on Alameda Street for three miles, a joint use by the Southern Pacific of main tracks on the river bank with either the Salt Lake or the Santa Fe, or the construction of its own main tracks on one side or the other along the river bank. The main tracks of the Salt Lake must be extended across the Los Angeles River on a viaduct to the area selected for the Union Station. The main track of the Santa Fe runs along the river side of the selected area but an extension of its main tracks will have to be made to bring it into the new station.

The order requires the joint use of land, tracks and terminal facilities valued at $28,050,691; the abandonment of three existing passenger stations of the railways as such, and the ultimate capital expenditure for all recommendations of from $25,000,000 to $45,000,000.

The Railroad Commission in the Supreme Court of the State pressed the argument that, in view of its finding that the Union Station was an indispensable element in getting rid of the grade crossings, it had the incidental right to order its building. The court rejected the argument. It said:

" That notwithstanding the views expressed by the Railroad Commission in its findings and conclusions in the proceeding herein presented for review, we can perceive no indispensable relation between the elimination of grade crossings and the establishment of union depot facilities, nor can we see an unsurmountable difficulty why jurisdiction over the matter of eliminating grade crossings may not be exercised in a proper case consistently, and it may be concurrently, with the exercise of the authority which is vested by the Act of Congress of 1920 in the Interstate Commerce Commission over the subject of union terminal depot facilities."

The State Supreme Court thus modifies the findings of the Railroad Commission in so far as they sought to tie the validity of its order establishing a union station to its unquestioned police power to regulate grade crossings in the interest of the public safety. We avoid any inquiry how far, if at all, the principle laid down in *Erie R. R.* v. *Board of Public Utility Commrs.*, 254 U. S. 394, is qualified by the provisions of the Transportation Act. Our only question here is whether the power to direct a new union station with its essential incidents is committed exclusively to the Interstate Commerce Commission under the Act of 1920.

In *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, 478, this Court said of the Transportation Act:

" The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the [Interstate Commerce] Commission, which is to supervise their issue of

securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged." *New England Divisions Case,* 261 U. S. 184; *Railroad Commission* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563.

On the one hand, it is urged that, with the purposes thus declared, the act commits to the supervision and control of the Interstate Commerce Commission such an undertaking as is here in question involving a new capital investment of from twenty-five to forty-five millions of dollars in the terminals of three great interstate railway systems in the largest city of our Western Coast. On the other hand, it is earnestly contended that, since no specific provision is made for the supervision of interstate union stations, by the Interstate Commerce Commission, the whole subject remains in the control of the state Railroad Commissions. We must examine the sections of the act in some detail to determine the force of these counter contentions.

The term railroad is defined in the act, par. 3, § 400, to include all switches, spurs, tracks, terminals and terminal facilities of every kind used or necessary in the transportation of persons or property, including freight depots, yards and grounds used therein. Section 402, after defining the term "car service" under the act as including use, control, distribution, and exchange of locomotives, cars and other vehicles used in interstate transportation, provides for just regulation of it by the Commission, and gives that body power, in case of shortage of equipment or other emergency, to suspend the regulations, to give just directions, without regard to ownership, to promote the service and to adjust proper compensation

for its use, and " to require such joint or common use of
terminals, including main-line track or tracks for a reason-
able distance outside of such terminals," as in the opinion
of the Commission will meet the emergency and the public
interest, and upon hearing determine just compensation
for use of same.    Paragraph 16 authorizes the Commis-
sion to provide transportation by other carriers if one
carrier is unable to handle its traffic upon terms fixed by
the Commission.

By § 405, amended § 3 of the Interstate Commerce Act
provides in its third paragraph that all carriers shall afford
all reasonable facilities for the interchange of traffic be-
tween their respective lines and for forwarding and deliv-
ering passengers.    Paragraph 4 provides that the Com-
mission may in the public interest and without impair-
ment of a carrier's power to handle its own business with
its terminal facilities, require the use of its terminal
facilities, including its main-line track or tracks for a
reasonable distance outside of its terminal—for another
carrier or carriers, upon such terms as may be agreed
upon by the parties, fixed by the Commission or deter-
mined by suit as in condemnation proceedings.

It is obvious from the foregoing that Congress intended
to place under the superintending and fostering direction
of the Interstate Commerce Commission all increased
facilities in the matter of distribution of cars and equip-
ment and in joint terminals, in the exchange of interstate
traffic and passengers between railways so as to make it
prompt and continuous.    It not only provides for the
temporary expropriation of terminals and main track of
one railway to the common use of one or more other
railways in an emergency, but it also contemplates the
compulsory sharing of one company's terminals with one
or more companies as a permanent arrangement.    This
is a drastic limitation of a carrier's control and use of its
own property in order to secure convenience and dispatch

for the whole shipping and travelling public in interstate commerce. It gives to the Interstate Commerce Commission the power and duty, where the public interest requires, to make out of what is the passenger and freight station of one interstate carrier, a union station or depot.

But it is insisted that the supervisory power thus conferred does not include the installation of an interstate union station, where its terminals and main tracks are newly built, and the interstate carriers are compelled to expropriate, not the terminal property of another interstate carrier, but property of others than carriers not theretofore used for terminals. This would be giving power to the Interstate Commerce Commission to provide for a small and contracted union station of interstate carriers limited to the terminals of one carrier, and would leave the larger and more important union stations of interstate carriers to the control of state commissions. We think, however, that means of control over installation of such new union stations for interstate carriers is given to the Interstate Commerce Commission in amended paragraphs (18 to 21) of § 402. They provide that no interstate carrier shall undertake the extension of its line of railroad or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation over such additional or extended line of railroad, unless and until the Commission shall certify that public convenience present or future requires it, and that no carrier shall abandon all or any portion of its line or the operation of it without a similar certificate of approval. Such a certificate is, we think, necessary in the construction of a new interstate union station which involves a substantial and expensive extension of the main tracks or lines of interstate carriers who theretofore have maintained separate terminals.

It is argued that paragraphs 18 to 21, of § 402, refer only to extensions of a line of railroad having the

purpose to include new territory to be served by the interstate carrier and do not refer to an extension of new main track for the mere purpose of rearranging terminals within the same city.  We do not think the language of paragraphs 18 to 21 can be properly so limited.  We are confirmed in this by paragraph number twenty-two which immediately follows:

" The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

This is a palpable distinction between the main tracks of an interstate carrier, and its spur, industrial, switching or side tracks, and shows the legislative intention to retain any substantial change in the main tracks within the control of the Interstate Commerce Commission.  It may well be that a mere relocation of a main track of an interstate carrier which does not involve a real addition to, or abandonment of, main tracks and terminals, or a substantial change in destination, does not come within the paragraphs 18 to 21.  One might, too, readily conceive of railroad crossings or connections of interstate carriers in which the exercise by a state commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the State for the public convenience and would not trench upon the power and supervision of the Interstate Commerce Commission in securing proper regulation of an interchange of interstate traffic or passengers.  Only a lawful order of the Interstate Commerce Commission would raise a question of the power of

a state commission in such cases, as the proviso of paragraph 17, § 402 of the Transportation Act shows:

"That nothing in this Act shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this Act."

But there is a great difference between such relocation of tracks or local union stations and what is proposed here. The differences are more than that of mere degree; they and their consequences are so marked as to constitute a change in kind. They come within paragraphs 18 to 21 of § 402 and require a certificate of the Interstate Commerce Commission as a condition precedent to the validity of any action by the carriers or of any order by the State Commission.

The proviso of paragraph 21 of § 402 is significant of the distinction we are pointing out. It forbids the Commission to authorize or order the extension of its lines "unless the Commission finds, as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension . . . that the expense involved therein will not impair the ability of the carrier to perform its duty to the public."

The extensions of the lines and main tracks of these railways under the plan which the State Commission has ordered are not great in distance, but they involve a new intramural destination for each railway with important changes in the handling of interstate traffic and passengers. Great expense attends such changes of the main tracks in a crowded city, and they here carry with them as necessarily incident thereto, the abandonment of available sites and of valuable existing passenger and freight stations and the construction of a new union station elsewhere, imposing on the three railways a cost in making

the changes of from twenty-five millions to forty-five millions of dollars.  We think it clear that in such an extension of main lines with their terminals the Interstate Commerce Commission is required by the act to make a finding that the expense involved will not impair the ability of the carriers concerned to perform their duty to the public.

The purpose of Congress to prevent interstate carriers from incurring expense which will lessen their ability to perform well their interstate functions is further shown in § 439 of the Transportation Act, whereby the Interstate Commerce Act is amended by insertion of § 20a.  This · new section subjects to the approval or rejection of the Interstate Commerce Commission the issue by an interstate carrier of all future shares of stock, bonds or other evidence of indebtedness and forbids approval unless the Commission shall find that their issue is for a lawful purpose, is compatible with the public interest, is appropriate and necessary to the discharge of its public duty as a common carrier and will not impair its ability to perform that service.  This is of course *in pari materia* with the restriction of paragraph 21 of § 402 to prevent a possible impairment of the financial ability of interstate carriers to discharge their interstate commerce duties.  Such a heavy burden as that involved in this new union station and the main track changes and extensions and other accessories would in all probability require the three railways to issue new capital securities and this could not be done without the approval of the Interstate Commerce Commission.  To be sure this provision only becomes operative when securities have to be issued and would not, of itself, prevent action by a state commission until such securities are seen to be necessary; but the provision indicates the general congressional plan.

We were advised by statements at the bar that, after the California Supreme Court handed down its decision in this case, the City of Los Angeles filed a petition with

the Interstate Commerce Commission asking for an order to provide, maintain and use a union station; that a hearing followed and that, pending the decision in this Court, the matter is held under consideration.

For the reasons given, we think the course taken by the City of Los Angeles was the correct one. Until the Interstate Commerce Commission shall have acted under paragraphs 18 to 21 of § 402 of the Transportation Act, the respondent railways can not be required to provide a new interstate union station and to extend their main tracks thereto as ordered by the State Railroad Commission.

The judgment of the Supreme Court of California is

*Affirmed.*