Plaintiff is a public corporation created pursuant to section 432 of the Conservation Law (Cons. Laws, ch. 65) and is authorized pursuant to section 446 of that statute to acquire real estate by condemnation. It brought this proceeding to acquire title to and possession of certain property of the Fonda, Johnstown and Gloversville Railroad Company in Fulton county. Its stated purpose was the construction of a dam and reservoir for the regulation of the flow of the waters of Sacandaga river which lie within the territory of the Hudson River Regulating District. Commissioners were appointed to ascertain the compensation to be paid for the property taken and they rendered a report which was confirmed. The order of confirmation has been unanimously affirmed on the law and the facts and it is attacked on several grounds.
Appellants contend that the finding of fact that plaintiff in good faith endeavored to purchase the lands and was unable to agree with the owners is without evidence to support it. The New York Trust Company is trustee for mortgage bondholders of the Fonda, Johnstown and Gloversville Railroad Company and as such is the owner of the mortgage which constitutes a lien on the railroad property and, therefore, is an "owner" as defined by section 2 of the Condemnation Law (Cons. Laws, ch. 73). Section 446 of the Conservation Law provides that if the Board cannot agree with the owners upon compensation and damage, it shall serve upon them a notice that the real estate has been appropriated. Prior to the institution of this proceeding, the Board requested a summary of the railroad's claim. As presented by the railroad and accompanied *Page 451 
by a letter of approval from the attorneys for the trust company it exceeded $4,000,000. After an informal oral discussion between representatives of the Board and of the railroad the Board made a written offer to the railroad of $550,000. Other oral conferences occurred which no direct representative of the trust company attended. The award in this proceeding was $1,442,130 for property which the railroad and the trust company claimed to be worth more than $4,000,000. The Board's offer, while far less than the amount awarded, is so much closer to the actual value than to the defendants' demand that no justification can be found in the charge that the Board did not act in good faith. The trier of the facts found that the offer was bona fide and that finding is fully supported. After the Board's attempt to agree with the railroad ended unsuccessfully, any effort to agree with the holder of the mortgage would have been futile and, therefore, was not required. When one of two owners of the same property refuses to come to an agreement, the other owner, even if willing, is powerless to act. When the negotiations for purchase failed, the Board adopted a resolution appropriating the real estate and, in accordance with section 446 of the Conservation Law, served written notice to that effect upon the railroad. It failed so to notify the trust company, except by the petition in this proceeding. Appellants argue that the words "as hereinafter provided" were inadvertently inserted in section 446 and are surplusage. The trial court held them to be without meaning and we agree. The petition was served upon the trust company twelve days prior to the date required and it included a statement that the Board had appropriated the real estate described therein.
Among the principal attacks made upon the validity of this proceeding is one which rests upon appellants' argument that the Sacandaga Reservoir is primarily and predominantly a power project. Section 430 of the Conservation Law defines the term "regulating reservoir" *Page 452 
and declares: "Such term is not intended to include a reservoir created by a dam constructed or maintained for power purposes, but is intended to include a reservoir at or by reason of which there may be, as an incident to the construction, maintenance and operation of such regulating reservoir, the possibility of the utilization of a portion of the water stored thereby for power purposes, without in any way interfering with the primary purpose of a reservoir constructed under the provisions of this article." The creation of river regulating districts is authorized by section 431 in order that they may construct, maintain and operate reservoirs for the purpose of regulating the flow of streams "when required by the public welfare, including public health and safety." By the statute, the generation of power is made an incident of a regulating reservoir; promotion of public health and safety is its primary purpose. The Board's determination and all its acts conform with the theory that it acquired defendants' property for the primary purpose of protecting public health and safety. By resolution it so declared. The facts before it are matters of common knowledge and are set forth in this record. They do not convince us that the Board's declaration was a subterfuge employed for the purpose of erecting a reservoir to be used primarily for generating power. The evidence proves that the territory through which flow the Hudson and its tributaries, including the Sacandaga, has long been subject to alternating droughts and floods. The floods devastate property, render cities and villages unsanitary and impede the operation of street traffic, railroads and factories. The droughts tend to deprive the inhabitants of wholesome water for drinking and bathing, interfere with filtration plants, cause accumulation of sewage and breed noxious germs. These facts, known to all, are abundantly proved. Appellants argue, however, that such conditions do not constitute the real motive for the Board's action but are used as a pretext for disguising *Page 453 
the actual project of a power plant. They say that the assessment of only five per cent of the cost upon the cities of Albany, Troy, Rensselaer and Watervliet and the village of Green Island as against ninety-five per cent upon private mill owners in the district is a significant point in such an argument. They urge that the extent of the benefits which will be derived by private business organizations from the reservoir, its capacity and the point of regulation, together with the activity of private beneficiaries toward the creation of the district show that power development is the primary purpose which the Board had in view. Lastly, they proclaim that conditions affecting public welfare, including public health and safety, will be improved only to a comparatively minor extent. With this argument we cannot agree. Public health and safety are superior to other considerations and their promotion in the measure shown in this case is sufficient justification for regulating the flow of the waters in this district. Other interests have been benefited by the promotion of this primary purpose. That does not matter. (U.S. v.Chandler-Dunbar Co., 229 U.S. 53.) Those beneficiaries must pay for what they got. Section 460 of the Conservation Law directs that the assessment of cost shall be "in proportion to the amount of benefit which will enure to each such public corporation and parcel of real estate by reason of such reservoir." The increased advantages derived by manufacturers can be measured in money. Salutary results to public health and safety are difficult, if not impossible, to appraise in terms of cash. That these private manufacturers exerted themselves toward the creation of this district from mixed motives may be taken for granted; doubtless their conduct was not wholly altruistic. By their efforts, partly selfish, the public good was enhanced. By their zeal, may be for personal profit, they contributed to a beneficent public purpose. No where on the Hudson watershed could a reservoir be constructed which would *Page 454 
more effectually regulate the flow. So testified defendants' engineer and so the courts have found. The evidence fully supports the finding that the Board's avowed purpose was the actual one. It was to regulate the flow as required by public health and safety.
Perhaps the most emphatic line of attack against this judgment and this order consists in the argument that the State is without authority to take property belonging to a common carrier engaged in interstate commerce. The judgment and the final order authorize the taking of nearly seven miles of main line track and right of way together with some stations, side tracks and terminals, but they also provide compensation for the cost of relocating these facilities. Any attempt to compel abandonment of the railroad without authority from appropriate agents of government would be frustrated by the courts. (Dayton-GooseCreek Ry. v. U.S., 263 U.S. 456, 478; Colorado v. U.S.,271 U.S. 153.) That the power to regulate interstate commerce resides in Congress and its delegate, the Interstate Commerce Commission, rather than in any of the several States is a proposition so fully acknowledged as to require no argument. We have frequently recognized this elementary rule. (People ex rel.N Y Central R.R. Co. v. Public Service Comm., 232 N.Y. 606;233 N.Y. 113.) That the right of abandonment depends upon permission of the Interstate Commerce Commission is conceded. Questions of regulation, abandonment and of direct interference with interstate commerce are not present in this case. The State does not seek to interfere with, regulate or to cause abandonment. Its purpose is to acquire part of the carrier's property in order to promote public health and safety and to pay enough to enable the carrier advantageously to relocate and continue operation. Such payment will constitute compensation for the damage inflicted by the taking. The language of the judgment and the order may perhaps fail in one respect to take *Page 455 
continued operation into the fullest account. They provide that, upon payment or tender of the amount determined to be due, the plaintiff shall be entitled to enter upon and take possession of defendant's property. Probably the decrees were not intended to operate as broadly as their language may seem to indicate, but they must be taken as they read upon their face. (Kansas CitySouthern Ry. Co. v. Kaw Valley Drainage District, 233 U.S. 75,76.) Section 445 of the Conservation Law directs the Board, in the exercise of its dominant right of eminent domain over the right of eminent domain of public corporations, to take due care to do no unnecessary damage and to refrain from interference with their operation and usefulness beyond the actual necessities of the case. No doubt the order and the judgment contemplate that the Board will so act. They may be susceptible of misconstruction, however, and conceivably the Board might regard them as authority to take immediate possession. To the end that full compliance may be had with section 445, the order and the judgment should be modified so as to suspend their complete effect until the railroad can relocate and construct a new line. The time for such relocation must, of course, be reasonable and should be stated in the order and judgment as modified. If the railroad company should fail to relocate its stations and tracks within such a reasonable time, its neglect would necessarily be construed as a voluntary abandonment. When the State takes this property and makes adequate provision for its location elsewhere it does nothing to regulate or to cause an abandonment. With the questions of abandonment and possible direct interference with interstate commerce eliminated from the case, the right to acquire and take possession of the property is clear. In this proceeding the State does not pretend to exert its police power It is exercising its power of eminent domain, a power which is inherent in every sovereign and has not been surrendered to the *Page 456 
United States. (Cincinnati v. L. N.R.R. Co., 223 U.S. 390.) Even though interstate commerce may indirectly or incidently be involved, a State, even in the exercise of its police power, may adopt protective measures of a reasonable character in the interest of health, safety and welfare of its people. (MinnesotaRate Cases, 230 U.S. 352, 396.) No direct interference with interstate commerce can be spelled out of an act by which a carrier is forced to do no more than to change the location of one or two small stations and some parts of its tracks. (Denver Rio Grande R.R. Co. v. Denver, 250 U.S. 241.) The consequences flowing from this judgment and this order are not different in principle from the effect produced by proceedings to compel the removal of grade crossings. That the State can cause the elevation or depression of structures constituting parts of railroads carrying interstate commerce is firmly settled. (ErieR.R. Co. v. Board of Public Utility Commrs., 254 U.S. 394,410, 411; Lehigh Valley R.R. Co. v. Bd. Pub. Utility Comm.,278 U.S. 24.) There is no extension of an existing line or a construction of a new line within the purview of the Transportation Act of February 28, 1920 (41 Stat. 456). There is a mere relocation with no addition to or abandonment of tracks or terminals and no substantial change in destination. The changes are those which the Supreme Court intimates to be within even the police power of a State to accomplish. (R.R. Comm. v. SouthernPac. Co., 264 U.S. 331, 345.)
Appellants urge that they are entitled to a larger sum of interest than they have received on their award. They claim that the award bears interest from the date of the judgment until thirty days after the entry of the final order. Section 13 of the Condemnation Law provides for a trial on issues raised by the petition and answer and the entry of a judgment adjudging the necessity of the condemnation of described real property and for the *Page 457 
appointment of commissioners to ascertain compensation. Such ajudgment was entered. Section 15 commands, in the event of confirmation of the report of the commissioners appointed in the judgment pursuant to section 13, that the court shall enter afinal order directing payment of compensation to property owners and provides that thereupon the Board shall be entitled to enter upon the property and hold it for the public use specified in the judgment. Such a final order was entered. The Condemnation Law marks a clear distinction between the judgment and the final order. Turning to the Conservation Law, we find in section 446 a provision relating to the right of entry and the allowance of interest on awards for property taken under the Condemnation Law. According to this section the Board shall have no right to enter and take possession until the owner shall have been paid or tendered the amount due "under the final order andjudgment in such proceedings with interest." Section 457 of the Conservation Law directs: "Payments of the amount due upon suchfinal order and judgment with interest from the date of thejudgment until thirty days after the entry of such final orderand judgment, and payments for real estate taken by agreement, shall be made out of the general fund of the district." If this section intends the expression "final order and judgment" to mean the final order provided for by section 15 and if it intends the word "judgment" literally to mean the judgment provided for by section 13, then the appellants are right and are entitled to interest from the date of the entry of that judgment. This conclusion is the most nearly reasonable one to be drawn from language somewhat baffling. We think that the draftsman of the Conservation Law used the word "judgment" in the same sense in which it is employed in section 13 of the Condemnation Law and that he intended, by "final order and judgment," to indicate the final order provided for in section 15 of the Condemnation Law. *Page 458 
The judgment and the final order should be modified by al owing interest from May 14, 1926, the date of the entry of the judgment at Special Term, and further modified by providing for a term of one year from the date of entry of this order within which appellant railroad company can relocate its tracks, stations and terminals before surrendering possession, and in the event that such time shall, after diligent effort, prove insufficient, such reasonable additional time thereafter as may be allowed by the Supreme Court and as so modified affirmed, without costs.
CARDOZO, Ch. J., POUND, CRANE, ANDREWS, LEHMAN and KELLOGG, JJ., concur.
Judgment accordingly.