NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, SUSQUEHANNA TRANSIT COMMUTERS ASSOCIATION, ERIE RAILROAD COMPANY AND THE DELAWARE, LACKWANNA AND WESTERN RAILROAD COMPANY, RESPONDENTS.

Argued March 2, 1959—Decided April 20, 1959.

514

Mr. *Leon Leighton,* of the New York Bar, argued the cause for appellant (*Messrs. Lum, Fairlie & Foster,* attorneys).

Mr. *Howard T. Rosen,* Deputy Attorney General, argued the cause for respondent, Board of Public Utility Commissioners, etc. (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

*Mr. James M. Davis, Jr.* argued the cause for respondent, Susquehanna Transit Commuters Association (*Messrs. Powell and Davis,* attorneys).

The opinion of the court was delivered by

FRANCIS, J.   Until recently the Erie Railroad Company transported passenger traffic on both its main and branch lines into its terminal in Jersey City, New Jersey.   From that point, carriage to the downtown area of New York City was accomplished by means of the Erie ferry which plied across the Hudson River between the terminal and Chambers Street, New York City.

Passengers of the New York, Susquehanna and Western Railroad Company (an intrastate operation.   See Susquehanna brief in A–202–57) were carried to the Erie Jersey City Terminal where they also took advantage of the Erie ferry service to Chambers Street.   The final stages of the Susquehanna run were over a portion of the Erie tracks under a trackage agreement between the two railroads.   The same situation applied to the New Jersey and New York Railroad Company (hereafter called Jersey), which was being operated by a trustee.   *Erie R. Co. Ferry Abandonment,* 295 *I. C. C.* 549 (1957).

Erie and Jersey acquired rights over the tracks of the Delaware, Lackawanna and Western Railroad, including joint use of the Lackawanna's Hoboken terminal and station, and its ferry service across the Hudson.   Thereupon, Jersey's use of the Erie Jersey City Terminal and the ferry facilities from that point ceased, and its passengers were brought into Hoboken.   Erie also carried its main line and Greenwood Lake branch passengers to that terminal.   Two of Erie's ferries were sold to Lackawanna as part of the transaction. The Erie Northern Branch and the Susquehanna passengers continued to proceed to the Jersey City terminal and to use the ferry service, which was then curtailed because of the reduced need.

On December 26, 1956 the Northern Valley Commuters Organization instituted this action before the Board of Public Utility Commissioners seeking an order directing the Erie to re-route its Northern Branch passenger trains so that they too would originate and terminate carriage at the Hoboken Terminal of the Lackawanna, rather than at the Erie Jersey City Terminal. Some time later the Susquehanna Transit Commuters Association applied for the same type of order to require the Susquehanna to re-route certain of its trains to bring about the Hoboken origin and termination. The proceedings were consolidated and the three railroads—Erie, Susquehanna and Lackawanna—participated in the hearings as parties.

During the pendency of the consolidated actions Erie pressed an application before the Interstate Commerce Commission for approval of the complete abandonment of its Jersey City ferry service. Subsequently the authorization was given, whereupon the validity of the order was made the subject of attack in the courts. The United States District Court for the District of New Jersey affirmed the Commission action, *State of New Jersey v. United States,* 168 *F. Supp.* 342 (*D. C. N. J.* 1958), and the service was discontinued. The order of abandonment in a companion case involving the New York Central Railroad was affirmed by the United States Supreme Court on March 2, 1959. 359 *U. S.* 922, 79 *S. Ct.* 603, 3 *L. Ed. 2d* 625 (1959).

At the hearings before the New Jersey Board the railroads contended that jurisdiction over the problem was vested exclusively in the Interstate Commerce Commission. And originally, on the merits, they claimed that the remedy sought by the commuters' associations was opposed to the public interest and convenience. At the final hearing, however, on January 15, 1958, Erie announced that it and Lackawanna had made a recent joint study of current train operations into and out of the Hoboken Terminal. As a result, Erie submitted a counter-proposal to those suggested by its commuters. The plan offered contemplated a transfer

of its Northern Branch trains into Hoboken by operation over Lackawanna tracks on which Erie holds trackage rights approved by the Interstate Commerce Commission. More specifically, the route comprehended the movement of the Northern Branch trains to an existing point of connection with the Erie Main Line (the latter phase of this movement being over the portion of the Erie tracks in use jointly by the Northern Branch and the Susquehanna). At that point, a back-up operation would take place in a generally northerly direction over the Erie Main Line to an existing connection with the tracks of the Boonton Branch of the Lackawanna, and from there southerly along the Boonton Branch tracks to their connection with the Lackawanna Main Line, and thence eastward to the Hoboken Terminal. Only approximately eight minutes would be added to the Northern Branch running time.

When the counter-proposal was made with respect to the feasibility of accommodation by Lackawanna of the Northern Branch trains, nothing was said as to whether the "recent" study included provision for the re-routing of Susquehanna trains into Hoboken. In this connection it seems reasonably plain from the Interstate Commerce Commission opinion in *Erie R. Co. Ferry Abandonment, supra* (which Susquehanna presented to us in its reply appendix), that the study was made at least as far back as early 1956, and that it did take into account the Susquehanna trains. The pertinent portion says:

"Under the coordination plan as partially implemented, the trains of Susquehanna and the Northern branch continue to be operated into and out of the Jersey City station. Sufficient tracks, platforms, public convenience facilities, and incidental services are provided at the Erie's terminal to accommodate all passengers of the trains that presently, and in the future will continue to, utilize that terminal. To do otherwise would require an arrangement whereby the *Susquehanna* and the *Northern branch* trains to Hoboken would be routed over the Erie trackage presently used by those trains to a point east of Croxton, backing onto the Erie's main line about 1.2 miles in opposition to the predominant flow of traffic, to the new connection with the Lackawanna's Boonton branch near the Erie's milepost

3.17, thence proceeding to the Hoboken terminal. A corresponding backup against the flow of traffic would be involved in the reverse direction. That route would avoid the continuance of operations into the Erie terminal and would take advantage of the most favorable conditions as to grade crossings, switches, and connections, and involve passenger trackage only.

On the basis of test runs over existing trackage best suited to simulate the backup required to reach the Lackawanna tracks and terminal, the Erie's engineers estimate that the required shuffling of the *Susquehanna* and the *Northern branch* trains would require the addition of 10 minutes to the present eastbound schedules and 8 minutes' extra time westbound. The estimate reflects the additional time needed to complete the run plus an allowance of about 2 minutes to avoid undue interference with the operation of the other Erie trains and those of the Jersey and the Lackawanna, the proposed schedules of which also might require adjusting if the backup move is instituted." (Emphasis added)

The back-up operation so described appears to be substantially the same movement Erie reported in the present case as feasible for its Northern Branch trains. And the factual statements drawn from the Interstate Commerce Commission opinion support a clear inference that the same back-up movement was an equally practicable means of bringing the Susquehanna trains into Hoboken. But the testimony referred to in the Ferry Abandonment case was not produced here, although in the course of the hearings when an objection was made as to the competency of one of the commuters' associations' witnesses the examiner said:

"* * * I am hopeful that the railroad people, Mr. Hoffmann and Mr. Leighton and Mr. Nasmith, that you will have some qualified operating people in here at some time during the course of this case to testify on the technical aspects of the operation."

The invitation went unheeded, and in the ultimate submission of the counter-proposal to take care of the Northern Branch passengers no references to the Susquehanna people were made. Significantly, however, no proof was offered to demonstrate that the Susquehanna trains could not be accommodated in the same way or that any such plan was opposed to the public interest and convenience. In any event, without awaiting the decision of the Board, on July 14,

1958 Susquehanna filed an application (which is still pending) with the Interstate Commerce Commission for a certificate authorizing it to abandon both passenger and freight operations over the portion of Erie tracks for the use of which it held a trackage agreement. The effect of such abandonment would be to terminate the run at Susquehanna Transfer, a way station five miles from Jersey City. From that point the passengers would have to travel by bus to the Port Authority Bus Terminal in midtown Manhattan. And then those persons with a downtown New York destination would proceed by subway to that area.

Moreover, it seems obvious that in the Ferry Abandonment case, the parties presented the facts as to the adequacy and convenience of the Lackawanna terminal facilities and ferries to handle all Erie and Susquehanna trains and passengers if the back-up movement were adopted. The Commission found:

"Physically, the facilities of the Lackawanna's railroad and ferry terminal and stations are larger, more complete and convenient, more modern, and in better repair than the Erie's. The record shows that they have ample capacity to handle additional trains, ferryboats, and passengers.

\*    \*    \*    \*    \*    \*    \*    \*

On reviewing the record and considering the recent experience in handling the combined passenger load of the Lackawanna, the Erie, and the Jersey trains, we find that the Hoboken terminal facilities, the ferry terminal at Barclay Street, and the ferryboats which are operated by the Lackawanna are adequate to handle all the trains and passengers involved in the coordination herein."

At the conclusion of the hearings in the instant case, the examiner reported favorably on the Erie-Lackawanna counterproposal for the switching of the Northern Branch trains into Hoboken. He found that discontinuance of the trains into the Jersey City terminal would be in the public interest, and would reduce Erie's losses, conserve its assets and reduce the burden on other essential services. He found also:

"(d) that the requirements of public convenience and necessity for passenger service of patrons of the Northern Branch and of Sus-

quehanna Jersey City trains would be better served by operation of these trains to and from the Hoboken Terminal of the Lackawanna Railroad where more modern and more adequate terminal facilities are maintained, where more frequent ferry service is provided, and where Hudson and Manhattan tube train service is also available."

Further, the longer running time and the route comprehended to reach Hoboken were declared to provide safe, adequate and proper service and to meet the requirements of public convenience and necessity.

On the basis of the findings and recommendations, the Board of Public Utility Commissioners directed

"* * * [t]he Erie Railroad Company to operate its Northern Branch trains to and from the Hoboken Terminal of The Delaware, Lackawanna and Western Railroad Company over the route described in its counter-proposal * * *."

And the Board ordered

"* * * [t]he New York, Susquehanna and Western Railroad Company to operate its Jersey City trains to and from the Hoboken Terminal of the Delaware, Lackawanna and Western Railroad Company over the route described in the Erie counter-proposal, and to take forthwith any and all steps necessary to acquire trackage rights from the Erie Railroad Company and The Delaware, Lackawanna and Western Railroad Company that may be needed to effectuate such operation, and to effectuate said re-routing of its trains on or before February 2, 1959 * * *."

Of course, neither the Erie nor the Lackawanna appealed from the portion of the order relating to the operation of the Northern Branch into Hoboken. The proposal emanated from them. The result of all of the arrangements among Lackawanna, Erie and the New Jersey and New York is that their passengers on the various main line and branch routes are being transported to and from a common and convenient terminal at Hoboken. Susquehanna's passengers have become orphans of the storm.

Susquehanna appeals from the order (1) to operate its trains to and from Hoboken in the manner agreed upon by Erie and Lackawanna for Erie's and Jersey's commuters,

and (2) to "forthwith" take all steps necessary to acquire trackage rights from Erie and Lackawanna to make the operation possible. We have granted certification on our own motion.

The primary opposition is predicated upon the contention that the order is *ultra vires* because jurisdiction over the subject matter has been committed by Congress exclusively to the Interstate Commerce Commission.

■ The Board of Public Utility Commissioners has "general supervision and regulation of and jurisdiction and control over" all public utilities, including railroad companies. *N. J. S. A.* 48:2–13. Authority was conferred specifically to require "safe, adequate and proper service," *N. J. S. A.* 48:2–23; *Pennsylvania Railroad Co. v. Department of Public Utilities, Board of Public Utility Com'rs,* 14 *N. J.* 411 (1954), to order a railroad to establish at any junction or point of connection or intersection with any other railroad "such just and reasonable connections as shall be necessary to promote the convenience of passengers," *N. J. S. A.* 48:2–26, and to direct the reasonable extension of existing facilities upon certain conditions relating to *quantum* of business and the financial condition of the utility. *N. J. S. A.* 48:2–27.

■ Congress has conferred on the Interstate Commerce Commission broad, pervasive power to regulate railroad transportation in interstate commerce. 49 *U. S. C. A.* § 1 *et seq.* The purpose, of course, was to prevent multiple control by state and federal agencies and to avoid the conflicts which were considered to burden, injure or interfere with interstate commerce. And in the areas covered by the Interstate Commerce Act, the jurisdiction of the Commission is paramount and exclusive. *Transit Commission v. United States,* 289 *U. S.* 121, 53 *S. Ct.* 536, 77 *L. Ed.* 1075 (1933). There was no intention, however, to render the regulatory commissions of the states completely impotent. 49 *U. S. C. A.* § 1(17)(a) provides that:

"* * * [N]othing in this chapter shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except insofar as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this chapter and except as otherwise provided in this chapter."

Over the years, notwithstanding the broad language used by the national and state Legislatures to delineate the boundaries of their jurisdiction, the Commission and the state agencies have functioned in a manner which has served the interest of both sovereignties and yet has recognized and preserved the superior authority of the federal agency. Intrastate railroad commuter problems and service have been regulated at the state level when required by the public convenience and necessity and when the action taken imposed no significant burden on the ability of the carrier involved to render its interstate service. *Pennsylvania R. Co. v. Board of Public Utility Commissioners*, 11 *N. J.* 43 (1952); and see *In re New York, Susquehanna & Western R. Co.*, 25 *N. J.* 343, 351 (1957); *In re New Jersey & New York R. Co.*, 12 *N. J.* 281 (1953), appeal dismissed *New Jersey & N. Y. R. Co. v. Board of Public Utility Com'rs*, 346 *U. S.* 868, 98 *L. Ed.* 378 (1953); *Terminal R. Ass'n of St. Louis v. Brotherhood of Railroad Trainmen*, 318 *U. S.* 1, 8, 63 *S. Ct.* 420, 87 *L. Ed.* 571 (1943); *Atchison, T. & S. F. R. Co. v. Railroad Commission*, 283 *U. S.* 380, 391–393, 51 *S. Ct.* 553, 75 *L. Ed.* 1128 (1931); *Railroad Commission of State of California v. Southern Pac. Co.*, 264 *U. S.* 331, 345, 44 *S. Ct.* 376, 68 *L. Ed.* 713 (1924).

But Susquehanna relies particularly upon 49 *U. S. C. A.* § 5(2)(a), which says:

"It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—
* * * * * *
(ii) for a carrier by railroad to acquire trackage rights over, * * * or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto."

Subdivision (*b*), so far as pertinent, is as follows:

"\* \* \* If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subparagraph (a) and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable, \* \* \*."

Subdivision (*c*) provides:

"In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected."

§ 5(4) ordains that:

"It shall be unlawful for any person, except as provided in paragraph (2), to enter into any transaction within the scope of subparagraph (a) thereof \* \* \*."

And § 5(11):

"The authority conferred by this section shall be exclusive and plenary, \* \* \*."

Reliance upon the cited portions of the Interstate Commerce Act is misplaced. They do not proscribe the voluntary making of a trackage agreement by two or more railroads; nor do they stand in the way of a state commission order to do so when paramount intrastate interests are involved. Their function is to make the ultimate validity and effectiveness of the agreement depend upon the approval of the federal agency. In short, such compacts cannot be put into operation until the Commission sanction is obtained.

The Commission has declared that it lacks authority to require railroads to enter into a trackage agreement. *Baltimore & O. R. Co. Operation,* 261 *I. C. C.* 535, 544 (1945). The position finds support in *Interstate Commerce Commission v. U. S. ex rel. City of Los Angeles,* 280 *U. S.* 52, 50 *S. Ct.* 53, 74 *L. Ed.* 163 (1929); and see *Thompson v. Texas Mexican Ry. Co.,* 328 *U. S.* 134, 149, 66 *S. Ct.* 937, 90 *L. Ed.* 1132 (1946). Accordingly, if adequate service of intrastate railroad passengers required the acquisition of trackage rights and the carriers refused to negotiate such an agreement, under Susquehanna's claim of exclusive Commission control, a power vacuum would exist. That difficulty was recognized and solved by the United States Supreme Court in the *Los Angeles Passenger Terminal Cases.* Those cases concerned the propriety of an order of the California Railroad Commission directing certain railroads, which carried local as well as interstate passengers, to build an interstate union terminal in the City of Los Angeles. Implicit in the order was a mandate to abandon their existing terminals and tracks and to build new tracks and to acquire trackage rights into the new station.

The proceedings were begun before the State Commission in 1916. Enactment of the Transportation Act of 1920 intervened, and before the validity of the order was sustained and the jurisdictional lines of the federal and state agencies settled 15 years had passed during which the litigation was given attention by the United States Supreme Court on three occasions. *Railroad Commission of State of California v. Southern Pac. Co., supra; Interstate Commerce Commission v. U. S. ex rel. City of Los Angeles, supra; Atchison, T. & S. F. R. Co. v. Railroad Commission, supra.*

 Out of those decisions the Board of Public Utility Commissioners drew the conclusion that the procedure to be followed in situations like the present one where in connection with the carriage of intrastate passengers public convenience and necessity require acquisition of trackage and terminal rights by one carrier from another, is for the

state agency to direct the negotiation of such a contract. Upon its consummation, the next and essential step is to present it to the Interstate Commerce Commission for approval.

Although the boundaries of the agencies may be somewhat shadowy in relation to a specific factual framework, the cases cited furnish substantial support for the course adopted by the Board. In *Atchison, supra,* the Supreme Court said:

"The considerations which led the Court to the conclusion that the power to compel the construction of such terminals had been withheld from the federal commission also make it clear that the authority which resided in the state had not been taken away except to the extent that the approval of the federal commission was required. The principle thus applicable has been frequently stated. It is that the Congress may circumscribe its regulation and occupy a limited field, and that the intention to supersede the exercise by the state of its authority as to matters not covered by the Federal legislation is not to be implied unless the Act of Congress fairly interpreted is in conflict with the law of the State." 283 *U. S.*, at *pages* 392, 393, 51 *S. Ct.* at *page* 556.

And in one of the intermediate proceedings in the same group of *Los Angeles Passenger Terminal Cases,* 100 *I. C. C.* 421, 430, 459 (1925), the Commission in discussing the mechanics for accomplishing the desired result suggested:

"For orderly procedure it appears preferable that appropriate certificates in connection with the proceedings now before us should be issued subsequent, rather than prior to, the making of an order by State authority, but that the securing of favorable action on our part be made a prerequisite to the effectiveness of any State order. Such a procedure would enable us to pass upon a specific proposal and obviate the semblance of consenting in advance to construction the extent and expense of which could only be surmised."

The order under attack, although perhaps not as explicit as it might be, resulted from pursuit of that advised pattern. It followed a factual determination that the intrastate public convenience and necessity called for carriage of the Susquehanna passengers into Hoboken by substantially the same re-routing movement which Jersey, Erie and Lackawanna had mutually agreed upon with respect to the Jersey

and Erie passengers, and it directed Susquehanna to take all steps necessary to acquire the trackage rights from Erie and Lackawanna to effectuate the change. True, the order does not in so many words instruct Susquehanna to seek Interstate Commerce Commission approval when and if the agreement is consummated. But manifestly such a mandate is implicit.

The order exhibits no intention, express or implied, to transgress upon the federal domain. Whatever the concord reached, it would be subject to full review by the Commission as to its effect upon the interstate commerce activities of the railroads involved and their ability, physical and financial, to perform them. In spite of the somewhat meager record, the facts appear to justify a finding of the Board (1) that additional expense to Erie and Lackawanna to re-route the Susquehanna trains to Hoboken would be minimal, (2) that as to Susquehanna the relatively comparable trip into Hoboken which would be substituted in major part for the present one into the Erie Jersey City Terminal would in turn undoubtedly be reflected in a decrease of the cost of trackage rights under the existing agreement with Erie, (3) existing tracks of all three roads are adequate for the entire re-routing project, and (4) that all of the evidence adduced and the inferences therefrom, including the record in *Erie R. Co. Ferry Abandonment, supra* (which was furnished to us by Susquehanna), warranted the determination of the Board that the re-routing and the order to acquire the trackage rights are required by the local public convenience and necessity. In this last connection, the language of the court in *Railroad Commission of State of California v. Southern Pac. Co., supra,* is noteworthy:

"It may well be that a mere relocation of a main track of an interstate carrier which does not involve a real addition to, or abandonment of, main tracks and terminals, or a substantial change in destination, does not come within the paragraphs 18 to 21. One might, too, readily conceive of railroad crossings or connections of interstate carriers in which the exercise by a state commission of the power to direct the construction of merely local union stations

or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the state for the public convenience, and would not trench upon the power and supervision of the Interstate Commerce Commission in securing proper regulation of an interchange of interstate traffic or passengers." 264 *U. S.*, at *page* 345, 44 *S. Ct.* at *page* 379.

Complaint is made that the questioned order is ineffectual because it directs Susquehanna to take the necessary steps to acquire the trackage rights but contains no directive to Erie and Lackawanna to negotiate for or to grant such rights upon reasonable terms. Undoubtedly, since the latter two railroads participated in the proceeding, their inclusion as parties to the mandate would have expedited ultimate decision in the matter. However, it must be assumed that Susquehanna will proceed in good faith to negotiate as ordered and that Erie and Lackawanna will do likewise, even though they are not named specifically as parties therein. If agreement is not reached within a reasonably short period after our opinion is filed, presumably the Attorney General will apply on notice to make Erie and Lackawanna parties to the order.

██ Strenuous protest is presented against the apparent intention of the order that when fair terms for trackage rights are established by voluntary action of the railroads or fixed after proper hearing, Susquehanna must apply to the Interstate Commerce Commission for the necessary approval under 49 *U. S. C. A.* § 5, *supra*. Our attention is called to the fact that Susquehanna is not only opposed to any plan for the transportation of its passengers into Hoboken, but that in addition it has petitioned the Commission for permission to abandon the carriage of passengers over Erie trackage into the Erie Jersey City Terminal. For these reasons it is said to be unfair and incongruous to impose a requirement to make an agreement to which the railroad is opposed, which is inconsistent with the pending request for leave to abandon certain trackage rights which must continue if the Hoboken re-routing is to be accom-

plished, and then to impose the further incompatible obligation of seeking approval of the agreement. Of course, Susquehanna may comply with the order while reserving fully its right to oppose every feature of state Board approved trackage use acquisition which it claims will operate to the detriment of interstate transportation. *Texas & P. R. Co. v. Gulf C. & S. F. R. Co.*, 270 *U. S.* 266, 273, 46 *S. Ct.* 263, 70 *L. Ed.* 578 (1926). Although accepting the view that the Board intended by the order to require the railroad to proceed in the manner indicated, we agree that the method is cumbersome and difficult for all concerned. The Board itself, as the representative of the State, has adequate standing to initiate the proceeding when and if the matter becomes ripe for the taking of that step. *Atchison, T. & S. F. R. Co. v. Railroad Commission, supra,* 283 *U. S.,* at *page* 394, 51 *S. Ct.* at *page* 557; *Thompson v. Texas Mexican Ry. Co., supra,* 328 *U. S.,* at *page* 145, 66 *S. Ct.* at *page* 944. Accordingly, when an agreement is consummated by the carriers voluntarily or entered into on reasonable terms fixed by the Board, the application for approval should be presented to the Commission by the Board.

Comment may be propitious as to alternative courses which Susquehanna suggests might have been pursued by the Board in order to seek on the federal scene the end result contemplated by the order under review. The suggestions are: (1) that the state agency may apply to the Commission to reopen the 1955 proceeding in which the trackage rights agreement between Erie and Lackawanna, under which Erie's passengers are being carried into Hoboken, was sanctioned, and to condition the continuance of the approval of that agreement upon a similar grant to Susquehanna. 49 *U. S. C. A.* § 16(6); *Froeber-Norfleet Inc., v. Southern R. Co.,* 9 *F. Supp.* 409 (*D. C. Ga.* 1934); 49 *U. S. C. A.* § 5(9); or (2) that in the pending Susquehanna application to abandon its existing trackage agreement with Erie which permits movement to and from the Jersey City terminal, the Board may advance a proposal to condition

the authorization upon the retention by Susquehanna of sufficient trackage rights with Erie and the acquisition of the necessary additional rights from Lackawanna to accomplish the re-routing of its passengers into Hoboken. 49 *U. S. C. A.* § 1(18), (20); *Interstate Commerce Commission v. Railway Labor Executives Ass'n,* 315 *U. S.* 373, 62 *S. Ct.* 717, 86 *L. Ed.* 904 (1942). We do not pass upon the problem of whether these avenues are open to the Board. It may be noted, in any event, that the abandonment petition was not filed until long after this action was instituted. Our decision is limited to the issue of the jurisdiction of the Board to take the course now being questioned. As to that, in our view the order entered has not been shown to be in excess of the residual state regulatory power.

■ Finally, we reach the contention that the order to acquire the trackage rights lacks sufficient or substantial evidence to support the finding of the Board that the proposed re-routing "would provide safe, adequate and proper service" within the purview of *N. J. S. A.* 48:2–23. The record submitted is somewhat meager. However, analysis of all of the facts adduced, as well as the exhibits and the history of the various proceedings (included in the appendix), with due regard for the expertise of the Board, has led us to the conclusion that a sufficient bottom existed for the making of the order. As has been indicated, the examiner extended an invitation and expressed the hope that the railroad parties would introduce the results of their studies of the feasibility of executing the desired re-routing. This was not done, although the total record fairly breathes the inference that such proof was available. If Susquehanna or the other carriers involved now wish an opportunity to submit further evidence on the subject, it may be had on prompt application to the Board for such permission.

For the reasons stated, the order is modified to the end that after the trackage agreement is made, the Board shall file the necessary application with the Interstate Commerce Commission for approval. In all other respects it is affirmed.

*For modification*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR—5.

*Opposed*—None.